UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert E. ILES, Sr.,
Defendant–Appellant.

Nos. 88–3055, 88–3445.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 10, 1989.

Decided June 28, 1990.

Patrick Hanley (argued), Asst. U.S. Atty., Cincinnati, Ohio, for plaintiff-appellee.

Robert E. Iles, Sr., Edgewater, Fla., pro se.

Robert D. Grossman (argued), Grossman & Flask, Washington, D.C., for defendant-appellant.

Before JONES and GUY, Circuit Judges, and ENGEL, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

Robert E. Iles, Sr., was found guilty of one hundred thirty-seven counts of criminal tax law violations. The Government argued at trial that three tax shelters promoted by Iles were utterly without economic substance and that many investors and the Treasury were consequently defrauded of millions of dollars. The primary issue in this appeal is whether the district court erred in appointing an attorney to represent Iles where the attorney initially had been retained by Iles and his wife, who was originally a codefendant. When the issue of the attorney's request to withdraw as retained counsel arose here, the district court was presented with two dominant issues: (1) the attorney's conflict of interest in representing both defendants caused by plea-bargain negotiations with the United States Attorney, and (2) the defendants' non-payment of attorney fees and claim of indigency. The district court addressed these problems by removing the attorney from the representation of Mrs. Iles and subsequently appointing the attorney to represent Mr. Iles, at the Government's expense. On appeal, Iles contends that he was dissatisfied with counsel and was embroiled in an irreconcilable conflict with him. He therefore argues that he was deprived of his Sixth Amendment rights when the district court appointed the attorney to represent him without inquiring into his alleged dissatisfaction. Iles, however, did not object to the appointment, did not express a wish to have new counsel appointed, and did not seek to conduct his own defense. In addition to arguing that he was deprived of his Sixth Amendment rights, Iles also argues that the evidence adduced at trial is insufficient to support his convictions. We find Iles' contentions to be without merit. As for Iles' ineffective assistance of counsel argument, however, we are precluded from reviewing this argument for the first time on appeal.

I.

On April 9, 1987, a grand jury returned an indictment against Robert E. Iles, Sr., and his wife Monica, charging them with one hundred thirty-nine counts of criminal tax violations. Count 1 charged both Iles and his wife with conspiracy to defraud the United States and numerous investors in connection with their promotion of three tax shelters, in violation of 18 U.S.C. § 371.[1] Both defendants were named in Counts 2 through 134, charging them with aiding and assisting in the preparation and presentation of false tax returns to the Internal Revenue Service, in violation of 26 U.S.C. § 7206(2).[2] The defendants were

1. 18 U.S.C. § 371 provides:

§ 371. Conspiracy to commit offense or to defraud United States

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. If, however, the offense, the commission of which is the object of the conspiracy, is a

misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor. Count 1 also alleged that the defendants carried out a scheme to defraud individual investors by means of false and fraudulent representations and through use of the U.S. mails, all in violation of 18 U.S.C. § 1341.

2. 26 U.S.C. § 7206 provides, in pertinent part:

§ 7206. Fraud and false statements

Any person who—

also charged in Count 135 with willfully filing their personal 1980 joint tax return knowing it was false in a material matter, a violation of 26 U.S.C. § 7206(1). In Counts 136 and 137, the appellant was charged with failure to file tax returns for 1981 and 1982, respectively, in violation of 26 U.S.C. § 7203. Monica Iles was charged in Count 138 and 139 with failure to file a tax return in 1981 and 1982, respectively.

Prior to trial, Monica Iles underwent surgery for cancer. In view of several continuances, the district court decided to proceed with the trial of Mr. Iles and severed Mrs. Iles from the trial. Mr Iles' trial began on November 2, 1987, and concluded on November 24, 1987, with jury verdicts of guilty on all one hundred thirty-seven counts. The judgment was entered upon the jury verdicts in the United States District Court for the Southern District of Ohio, Western Division, on May 13, 1988. Iles subsequently was sentenced to a term of thirteen years imprisonment and assessed a fine of $940,000. Iles appeals the convictions on the counts relating to the tax shelters.[3]

On this direct appeal from his convictions, Iles frames two issues for review:

I. Whether the appellant was denied his Sixth Amendment right to effective assistance of counsel as guaranteed by the U.S. Constitution where the Court, at the request and suggestion of the U.S. Attorney[,] appointed counsel originally retained by appellant to represent the appellant at the Government's expense when the Court had knowledge of appellant's dissatisfaction with said counsel and refusal to communicate with said counsel.

II. Whether the record in the instant action contained sufficient evidence to support appellant's conviction of conspiracy to defraud the United States and of willingly and knowingly aiding in the presentation and preparation of false income tax returns.

Iles has not challenged the convictions on the three counts pertaining to his false statements in his 1980 tax return and his failure to file tax returns for 1981 and 1982.

## II.

The events which formed the basis of Iles' convictions involved the promotion and sale of various tax shelters and the preparation and presentation of income tax returns for investors in these shelters. Iles initially was a bookkeeper in the Cincinnati, Ohio area. He provided a small bookkeeping, tax preparation, and financial consultation service through his operation of a sole proprietorship under the name of R. Iles and Associates. In 1978, the tax services were taken over by a separate entity, R. Iles Tax Consultants, Inc. Iles prepared income tax returns for clients and investors through this entity, which operated as an Ohio corporation beginning mid-year in 1978.

During early 1980, Iles also formed Structured Shelters, which was the primary

---

**(1) Declaration under penalties of perjury.—** Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or

**(2) Aid or assistance.**—Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document.

. . . .

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

3. Notices of Appeal were filed with the district court on January 8, 1988 and May 14, 1988. These matters were consolidated in this appeal. The appeal in No. 88–3055 is from a maximum sentence imposed upon Iles as a technical requirement for his commitment pending a sentencing study under 18 U.S.C. § 4205(c), a statute which has been repealed. Therefore, appeal No. 88–3055 presents no issues on appeal and is mooted by the subsequent May 13, 1988 judgment and sentence challenged in appeal No. 88–3445.

vehicle utilized to create, promote and sell tax shelters in the Cincinnati, Ohio area. Iles subsequently incorporated this sole proprietorship in August, 1980. Structured Shelters, Inc. marketed tax shelters on a national level in late 1980 and thereafter through a national system of chartered representatives. This criminal prosecution arises out of the local and national marketing of three tax shelters between 1980 and 1982: "Comprehensive Computer Systems 1980," "The Cocoa Trusts," and "Cocoa, Ltd."

The sixty-one page indictment outlines the basic structure by which Iles marketed the tax shelters.[4] Iles, personally and through Structured Shelters, undertook to entice prospective investors to invest in tax shelters by making various representations. Iles assured investors that by investing in the tax shelters, the investors would be entitled to deductions and credits on their income tax returns which would result in tax savings equal to or greater than the amount of the cash investment. Iles represented that the investors would only be investing tax dollars, but at the same time the investors would obtain a worthwhile investment. Iles also told investors that R. Iles Tax Consultants would prepare their tax returns if they wished.

Iles also offered to prepare "Random Reports" for investors through Random Processing Services, Inc., another corporation formed by Iles. These reports, compiled by using a computer program, provided a projection of the amounts of income tax an investor would be required to pay for a particular calendar year. These projections were designed so that the investor could determine how much money must be invested to eliminate or significantly reduce tax liability in that year. Some of these projections, however, were made after the end of the calendar year for investments in that year.

Before an investor could participate in a program, Iles initially required investors to establish a sole-proprietorship investment company through which investments would be made and tax deductions and credits would be taken. Investors also executed a management agreement, whereby Iles and Structured Shelters were to operate as the manager. Although the initial manager's fee was 10% of the "profits" generated by the investment companies, in 1981 the management agreements provided for a fee of 10% of the "proceeds" flowing through the investment companies plus 1% of the investor's gross income.

In 1981, many investors were required to establish their own individual trusts for deposits of money for tax shelters. The investors also were required to execute a Declaration of Trust, wherein Structured Shelters and Iles were named trustees. The trustees received absolute and exclusive authority to manage the Trust property and to conduct the Trust's affairs without the consent of the beneficiaries (*i.e.,* the investors).

Comprehensive Computer Systems 1980

In 1980 and 1981, Iles promoted and sold interests in a tax shelter known as Comprehensive Computer Systems 1980. Iles represented to investors that the money invested in this program would fund research and development to create a unique and advanced payroll computer program. The investment, Iles claimed, would entitle the investors to substantial tax deductions on their 1980 and 1981 income tax returns while providing them with a worthwhile investment.

Initial representations in the program's offering memorandum stated that investors were required to make a 10% cash down payment, with the balance to be reflected in a full-recourse promissory note. Nowhere in the offering memorandum was it stated how much an investor would need to invest in the shelter, nor how many units of ownership were being offered. Iles represented to investors that there was no set amount of investment, but that an investor should invest an amount sufficient to gen-

---

**4.** The indictment charges that Iles and his wife conspired to defraud the United States and numerous investors. The following discussion, however, is confined to the allegations as they pertain to Mr. Iles.

erate deductions which would eliminate or substantially reduce the investor's tax liability. Iles also assured investors that despite the terms in the offering memorandum requiring the recourse promissory note, they would not be personally liable to repay the note if the proceeds from the exploitation of the program were inadequate. The indictment alleged that investors never actually executed full-recourse promissory notes.

The terms of the offering memorandum were subsequently altered at the end of 1980. Under the new terms, Robert Iles Computer Services (RICS) would develop specific investment programs for each investor. Investors also were no longer required to execute a full-recource promissory note. Investors received instead a Bid Purchase Agreement, whereby the investor was required to pay 10% of his or her investment down. The balance of the investment was to be invoiced to the investors only when the programs were completed. Proceeds from the exploitation of the programs were to be assigned to RICS, which would apply the proceeds to the balance due in the invoice.

The indictment alleges that the money invested in the program was not used for research and development, but rather was converted to Iles' personal use and use in his various businesses. The indictment further charges that the shelter had no profit motive whatsoever and that much of the investment was based upon non-recourse debt. The indictment also alleges that although some of the investors did not invest in the program until 1981, tax returns were filed claiming research and development deductions on investors' 1980 tax returns. Therefore, the indictment alleges that in connection with the investment in Comprehensive Computer, Iles willfully caused investors to file tax returns

claiming false deductions for research and development.[5]

### The Cocoa Trusts and Cocoa, Ltd.

In 1980, Iles promoted a tax shelter known as "The Cocoa Trusts." Iles represented to investors that in return for their investment in this shelter, they would own an interest in a patent protecting a new process for "dutching" cocoa, purportedly a revolutionary process for producing cocoa in a more uniform and efficient manner. The investors' interest would include equity in a company named "Continental Dutch Cocoa" (CDC) and in manufacturing equipment to be used by CDC to process or "dutch" cocoa. The indictment alleges that although Iles represented that twenty-four interest units were to be sold, Iles sold more than thirty-three units.

During 1981 and 1982, Iles created Cocoa, Ltd. Iles represented, through a network of chartered representatives, that monies invested in this shelter would be used to fund research and development on a *computerized* manufacturing process of dutching cocoa. The representations surrounding this shelter apparently differed from The Cocoa Trusts by virtue of the computerization of this process. Iles also similarly represented to investors that they would receive an interest in the patent, the equipment, and CDC.

The indictment alleges that much of the investment in these two tax shelters was premised upon non-recourse debt, that Iles did not conduct the research and development, that equipment was not purchased, and that much of the money was converted to Iles' personal use and use in his various businesses. The indictment also alleges that Iles caused investors to file tax returns knowing that the claimed deductions and tax credits were false.[6]

5. Counts 2 through 41 of the indictment pertain specifically to investors in the Comprehensive *Computer* shelter and the preparation of tax returns for these investors. Counts 71 through 76 pertain to investors who invested monies in both the Comprehensive Computer shelter and The Cocoa Trusts shelter. The indictment alleges that forty-six individuals "invested" a total of

$1,278,727.90 in Comprehensive Computer, of which $127,872.79 was paid in cash.

6. Counts 42 through 70 pertain to investors in The Cocoa Trusts shelter and tax returns for these investors. Counts 77 through 134 pertain to investors in the Cocoa, Ltd. tax shelter and the tax returns for investors. The indictment alleges that thirty-seven investors "invested" a

### III.

■ Iles claims that the evidence adduced at trial was insufficient to support his convictions for conspiracy to defraud the United States and for willfully and knowingly aiding in the preparation and presentation of false income tax returns. As this court held in *United States v. Elkins*, 732 F.2d 1280, 1287 (6th Cir.1984), "a challenge on appeal to the sufficiency of the evidence will be determined by review of the evidence in the light most favorable to the government." *See also Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The reviewing court determines "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir.1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

To convict under 26 U.S.C. § 7206(2), the Government "must prove beyond a reasonable doubt that the defendant aided, assisted, procured, counseled, advised, or caused the preparation and presentation of a return; that the return was fraudulent or false as to a material matter, and that the act of the defendant was willful." *See United States v. Crooks*, 804 F.2d 1441, 1448 (9th Cir.1986), *modified on other grounds*, 826 F.2d 4 (9th Cir.1987); *United States v. Dahlstrom*, 713 F.2d 1423, 1426–27 (9th Cir.1983); *United States v. Perez*, 565 F.2d 1227, 1233–34 (2nd Cir.1977). The Supreme Court has defined "willfully" under section 7206 to mean a "voluntary, intentional violation of a known legal duty." *United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 23–24, 50 L.Ed.2d 12 (1976) (per curiam) (citations omitted).

Iles' sole contention on the sufficiency of the evidence question is that the Government failed to prove willfulness. Iles bases his argument upon an alleged genuine dispute as to whether the deductions and credits lawfully could be taken in connection with the tax shelters at issue. As the Supreme Court has stated, due process requires that a person be given "fair notice that his contemplated conduct is forbidden" so that he may conform his conduct to the requirements of the law. *See United States v. Batchelder*, 442 U.S. 114, 123, 99 S.Ct. 2198, 2203–04, 60 L.Ed.2d 755 (1979), *citing United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811–12, 98 L.Ed. 989 (1954).

Iles primarily relies upon *United States v. Dahlstrom*, 713 F.2d 1423 (9th Cir.1983), for the proposition that he was not given "fair notice" that his conduct was illegal. In *Dahlstrom*, the Ninth Circuit held that the defendants' convictions violated the first and fourteenth amendments because the defendants had no "fair warning that advocacy of the creation of lawful foreign trust corporations as a tax shelter would result in a criminal prosecution[.]" 713 F.2d at 1429. In so holding, the *Dahlstrom* court recognized that "criminal law concerns itself with willful violations of tax law ... and 'it's purpose is not to penalize frank differences of opinion.'" 713 F.2d at 1428 (quoting *United States v. Bishop*, 412 U.S. 346, 360, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973)) (citations omitted).

*Dahlstrom* is easily distinguishable. The "generic tax shelters" of the sort promoted by Iles have long been held to lack economic substance and clearly cannot support deductions and tax credits.[7] The Supreme Court has recognized, at least as far back as *Gregory v. Helvering*, 293 U.S. 465, 469–70, 55 S.Ct. 266, 267–68, 79 L.Ed. 596 (1935), that substance over form governs federal taxation. *See also United*

---

total of $6,507,835.26 in The Cocoa Trusts, of which $717,182.03 was paid in cash. The indictment also alleges that sixty-one investors invested $5,036,671.85 in Cocoa, Ltd., of which $1,052,550.50 was paid in cash.

7. Our conclusion is supported by the civil tax proceedings in this case. In *Rybak v. Commis-*

*sioner of Internal Revenue*, 91 T.C. 524 (1988), the tax court held that Iles' tax shelters lacked economic substance and disallowed the deductions and credits. As discussed below, the circumstances of this case fully support criminal liability.

*States v. Atkins,* 869 F.2d 135, 139 (2nd Cir.1989) (quoting *United States v. Crooks,* 804 F.2d at 1449) ("the 'doctrine of substance versus form is well ensconced in tax law'"); *see also United States v. Fruehauf Corp.,* 577 F.2d 1038, 1068 (6th Cir. 1978) ("The incidence of federal taxation has always depended upon the substance of transactions ..."). Here, the Government presented substantial expert testimony that the deductions and credits were based upon sham transactions "having no economic effect other than to create income tax losses." *Neely v. United States,* 775 F.2d 1092, 1094 (9th Cir.1985); *see also Knetsch v. United States,* 364 U.S. 361, 365, 81 S.Ct. 132, 134–35, 5 L.Ed.2d 128 (1960). Furthermore, Iles' conduct surrounding the creation of these tax shelters is entirely inconsistent with a claim of surprised innocence. Iles did not invest all the monies into the shelters and did not engage in research and development or purchase equipment. Instead, he converted much of the money to his own use and the use of his other businesses. As a blatant example of Iles' fraud, when some of the investors in the Cocoa Trusts shelter became discontent after learning that equipment had not been purchased, they were paid off by funds received from investors in the Cocoa, Ltd. shelter. The absence of a case with the precise factual circumstances as this case is of no consequence in light of the clear illegality of the conduct.

The Government also presented substantial evidence that Iles was well aware of the essential objectives of the conspiracy to defraud the United States and that he played a prominent role in the conspiracy. There is substantial evidence to support the conspiracy conviction. *See United States v. Jerkins,* 871 F.2d 598, 603 (6th Cir.1989). Therefore, after examining the evidence in a light most favorable to Government, we conclude that there was sufficient evidence to support the jury verdicts.

## IV.

■ Iles raises three arguments which he believes demonstrate that he was deprived of his Sixth Amendment rights:

1. The appointment of Mr. Makley as counsel for appellant at the suggestion of the U.S. Attorney was tantamount to appointment of defense counsel by the prosecutor[;] therefore such appointment of defense counsel was improper and an abuse of the district court's discretion.
2. Failure of the district court to make inquiry as to the appellant's dissatisfaction with counsel was an abuse of the district court's discretion resulting in denial of appellant's right to counsel.
3. The record clearly discloses that Makley failed to provide appellant effective assistance of counsel.

The first two issues appear to bear more upon Iles' Sixth Amendment right to counsel or choice of counsel. The third issue bears upon Iles' right to *effective assistance* of counsel, an issue which we hold must first be presented to the district court.

A review of the events leading up to the appointment of Roger Makley, Iles' attorney, is necessary. On May 4, 1987, Iles and his wife appeared at an arraignment by their retained counsel, Roger Makley, and his associate, Kevin O'Brien. The defendants entered pleas of not guilty on all counts. At a pre-trial conference held on June 9, 1987, the district court set a trial date of July 6, 1987. Defendants thereafter filed a motion for a continuance on June 16, 1987, claiming that they needed more time to prepare the case and to obtain additional documents. Persuaded by the complexity of the case, on June 24, 1987, the district court accepted the waiver of the time limit provided under the Speedy Trial Act, granted the motion, and set the matter for trial on October 20, 1987.

At a final pre-trial conference on September 28, 1987, defense counsel informed the district court that Mrs. Iles had undergone an operation for cancer and would be unable to stand trial on the October date. The district court rescheduled the trial date to November 2, 1987, in the hopes that the recuperation period would be sufficient for her to attend trial.

On October 5, 1987, Makley requested a telephonic in-chambers conference with the

district court. In this conference, Makley advised the district court that he thought he should withdraw as counsel for Robert and Monica Iles. Makley advised the court that during the course of plea bargain negotiations, the U.S. Attorney had tendered an offer to drop some of the charges against Mr. Iles and all of the charges against Mrs. Iles. Although Makley believed that the bargain was reasonable, he recognized that a conflict of interest had arisen. Makley informed the district court:

> ... My problem, as I see it, is twofold: first of all, the acceptance of the plea-bargain would result in one of the parties being dropped from the prosecution altogether, and under the circumstances that troubles me somewhat that [the] plea-bargain is not being accepted since I am in the position of representing both defendants.
>
> The second thing is that I am having difficulty in persuading my client what is necessary to prepare a defense in this case, given the fact he finds it unacceptable to take the plea-bargain that's offered. He has placed me in a position where I have been virtually unable to prepare a defense for him because I can't seem to persuade him of mechanically what has to be done and he is refusing my advice. [Transcript of the October 5, 1987 hearing, at 7.]

The district court set the matter for hearing and ordered Iles to appear.

On October 8, 1987, the district court held a hearing on Makley's motion to withdraw. In this hearing, with Iles in attendance, Makley advised that he wished to withdraw as counsel for several reasons. First, he stated to the district court that Mr. and Mrs. Iles told him that they were financially unable to meet their commitments under their fee arrangement. He also advised:

> The further problems that have developed, Your Honor, concern, I suppose, my serious differences of opinions with Mr. Iles on how the case is to be prepared for trial. Mr. Iles and I have reached the unfortunate point where he mildly disagrees with my advice and refuses to accept the judgment I bring to

the situation in an effort to provide what I believe to be an adequate defense to the charges against Mr. Iles and his wife. [Transcript of the October 8, 1987 hearing, at 3–4.]

The district court prepared to grant Makley's withdrawal motion, but first heard from the U.S. Attorney. On this issue, the U.S. Attorney stated that a newly appointed counsel might not have a proper opportunity to prepare the defense, which might prejudice the defendant. The district court fully agreed, stating that Iles "would be ill-advised not to have Mr. Makley who is an experienced lawyer in the federal courts."

The district court then asked Makley whether the conflict that he perceived would be eliminated if he were to be removed from the representation of Mrs. Iles. Makley replied:

> I would think so, Your Honor. I would have certainly not the same dilemma I otherwise would have if they were both tried at the same time, and given the generosity of the Government's plea-bargain for Monica Iles together with her present state of health, it puts me in a very difficult position to continue representation of her, both from the standpoint of [the] serious conflict that I perceive between the two even though they are husband and wife, and the fact that insofar as I know the situation to be, I have concerns about her ability to withstand a four- or five- or six-week trial even now.... [Transcript of the October 8, 1987 hearing, at 12–13.]

The district court removed Makley from representing Mrs. Iles and vacated the setting of her trial date. The district court then appointed Makley as counsel for Mr. Iles at the expense of the Government, thereby eliminating the problem of the fee arrangement. At this time, the district court accepted the representations that Iles was indigent.

The district court memorialized this decision in an October 9, 1987 Order. The district court stated, in part:

It is our observation that Mr. Iles is not only attempting to manipulate the trial, but is also attempting to create difficulties for this Court. During the hearing, Mr. Iles advised Mr. Makley and this Court that he did not have the funds necessary to obtain new counsel, or to pay Mr. Makley the monies owed him. We inquired of Mr. Makley if he would accept an appointment by the Court to represent Mr. Iles and he consented. In light of this fact, we permit Mr. Makley to withdraw as private counsel to Mr. Iles, and we appoint him as court-appointed counsel. Trial will proceed, as scheduled, on November 2, 1987. However, should it be discovered during trial that Mr. Iles has the funds to pay for his legal expenses, this Court will not hesitate to Order Mr. Iles to reimburse the United States Government.

As to Mr. Makley's defense of Mrs. Iles, we note the unfortunate circumstances she is in, having just undergone surgery for cancer. We also acknowledge the potential for ethical dilemmas resulting from Mr. Makley's representation of both Mr. and Mrs. Iles. Therefore, Mr. Makley is permitted to withdraw from his representation of Mrs. Iles.... [Order dated October 9, 1987, at 2.]

It is clear that the district court concluded that appointing Makley to represent only Mr. Iles solved the two problems presented. The district court acknowledged that there was a serious question about Mr. Iles' indigence, but accepted the representations and appointed Makley. Further, the district court concluded that removing Makley from the representation of Mrs. Iles solved the conflict of interest issue.

Iles first asserts that the "appointment by the District Court of Mr. Makley as defense counsel at the suggestion and request of the U.S. Attorney was tantamount to appointment of counsel by the prosecuting attorney." This argument borders on the frivolous. Judge Spiegel clearly was in control of this matter. Attorneys frequently are removed as retained counsel and subsequently appointed to represent defendants as the financial status of defendants change. The district court already had granted several continuances in this matter, and was plainly aware of the Speedy Trial Act implications in this maneuvering. Perhaps most important, the defendant voiced no objection to the appointment. Iles has not demonstrated that the district court unconstitutionally interfered with his Sixth Amendment rights on this issue.

▇ Iles also argues that the district court deprived him of his Sixth Amendment rights by not inquiring into his dissatisfaction with counsel. Iles focuses upon cases which require a personal colloquy with the defendant when the issue of substitution of counsel arises. It is hornbook law that "[w]hen an indigent defendant makes a timely and good faith motion requesting that appointed counsel be discharged and new counsel appointed, the trial court clearly has a responsibility to determine the reasons for defendant's dissatisfaction with his current counsel." LaFave and Israel, *Criminal Procedure*, § 11.4 at 36 (1984) (footnote omitted); *see also McMahon v. Fulcomer*, 821 F.2d 934, 942 (3rd Cir.1987); *Thomas v. Wainwright*, 767 F.2d 738, 741 (11th Cir.1985); *United States v. Welty*, 674 F.2d 185, 187 (3rd Cir.1982); *McKee v. Harris*, 649 F.2d 927, 933–34 (2nd Cir. 1981); *United States v. Williams*, 594 F.2d 1258, 1260–61 (9th Cir.1979) (per curiam); *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir.1970). The right to counsel of *choice*, unlike the *right* to counsel, however, is not absolute. An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate "good cause" to warrant substitution of counsel.[8] *See, e.g., United States v. Gal-*

8. In reviewing whether a district court abused its discretion in denying a defendant's motion to substitute counsel, appellate courts generally consider the timeliness of the motion; the adequacy of the court's inquiry into the defendant's complaint; and whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense. *See, e.g., United States v. Gallop*, 838 F.2d 105, 108 (4th Cir. 1988); *United States v. Allen*, 789 F.2d at 92; *United States v. Whaley*, 788 F.2d 581, 583 (9th

*lop*, 838 F.2d 105, 108 (4th Cir.1988); *United States v. Allen*, 789 F.2d 90, 92 (1st Cir.1986); *United States v. Young*, 482 F.2d 993, 995 (5th Cir.1973); *see also Nerison v. Solem*, 715 F.2d 415, 418 (8th Cir. 1983) (a defendant must show "justifiable dissatisfaction" with his appointed counsel to warrant substitution of counsel).[9]

■ An inquiry into whether the substitution of counsel is warranted serves several important goals. This procedural protection not only aids in determining whether "good cause" has been shown, but serves to ease the defendant's distrust, to preserve the integrity of the trial process, and to foster confidence in the jury verdict. Any inquiry into a defendant's dissatisfaction with counsel must of course be conducted delicately because of the danger of intruding into privileged communications. *See United States v. Welty*, 674 F.2d at 190.

■ The need for an inquiry will not be recognized, however, where the defendant has not evidenced his dissatisfaction or wish to remove his appointed counsel. Here, the defendant never expressed a desire to have Makley replaced or to proceed *pro se*. There was no motion for substitution of counsel or anything that approximated such a motion. The district court reasonably believed that the problems had been solved. In fact, defense counsel so stated that the conflict that *he* perceived was cured. There is no argument here that Iles told Makley that he wanted him removed, and that Makley did not so inform the court. We decline to assume that Makley misrepresented in open court his client's views, *i.e.*, that Iles wished to have new counsel and Makley failed to make his wish known.

■ We affirm the general principle that a district court usually must engage a defendant in person where he has expressed dissatisfaction with counsel and has sought to have him removed. In this case, however, the defendant never indicated that this was necessary. We think it clear that at a minimum " 'the defendant must show his hand.' " *Brown v. United States*, 264 F.2d 363, 366 (D.C.Cir.1959) (quoting *United States v. Mitchell*, 137 F.2d 1006, 1010 (2nd Cir.1943) (defendant failed adequately to disclose his wish to continue without counsel)); *cf. Moreno v. Estelle*, 717 F.2d 171, 175 (5th Cir.1983) ("we cannot infer both a waiver of counsel and a demand by the defendant to represent himself from the general statements of dissatisfaction with counsel contained in this record"). At no point did Iles try to "fire" his counsel, ask for new counsel, or suggest that he wished to conduct his own defense. Since the district court was not put on notice that Iles was dissatisfied with counsel and wished to have him removed or to have new counsel, the district court had no duty to inquire. *See Cheek v. United States*, 858 F.2d 1330, 1334 & n. 5 (8th Cir.1988) (the defendant failed to put the trial court on notice that he was dissatisfied with his attorney and therefore was not denied his Sixth Amendment right to retain counsel of his choice); *Birt v. Montgomery*, 725 F.2d

Cir.1986); *United States v. Rogers*, 769 F.2d 1418, 1423 (9th Cir.1985); *cf. Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir.1985). Further, "[c]onsideration of such motions requires a balancing of the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice." *Wilson v. Mintzes*, 761 F.2d at 280 (footnote and citations omitted). Judicial review obviously necessitates that such an inquiry be based upon a motion, or something that approximates such a motion. As discussed below, not only did the defendant never make such a motion, personally or through counsel, but Iles never tried to "fire" his appointed counsel, never moved for a continuance to seek new counsel, and never sought to represent himself.

9. The court may also substitute counsel when it is otherwise "in the interests of justice." 18 U.S.C. § 3006A(c) provides, in part:

**§ 3006A. Adequate representation of defendants**

. . . .

**(c) Duration and substitution of appointments.**—A person for whom counsel is appointed shall be represented at every stage of the proceedings from his initial appearance before the United States magistrate or the court through appeal, including ancillary matters appropriate to the proceedings. . . . The United States magistrate or the court may, in the interests of justice, substitute one appointed counsel for another at any stage of the proceedings.

587, 594–95 n. 15 (11th Cir.1984) (en banc) (distinguishing *Brown v. Craven, infra*) (trial court had no duty to inquire). The need to bring any serious dissatisfaction with counsel to the attention of the district court was particularly necessary here since Iles initially *retained* Makley, thus affirmatively demonstrating his initial confidence in Makley.

Several of the cases Iles relies upon to support his argument are easily distinguishable in that they involve reversals because the district court failed adequately to inform the defendant of the consequences of proceeding *pro se. See United States v. Welty,* 674 F.2d 185 (3rd Cir. 1982); *United States v. Williams,* 594 F.2d 1258 (9th Cir.1979) (per curiam). In both *Welty* and *Williams,* the defendants expressly stated that they wished to have counsel removed, and then conducted their defense *pro se.* This is not such a case.

Iles also cites *Brown v. Craven,* 424 F.2d 1166 (9th Cir.1970). In *Brown,* however, the defendant actively attempted to obtain new counsel. He personally filed four motions to have other counsel appointed and stated unequivocally in open court his dissatisfaction with appointed counsel. As the *Brown* court stated:

> Brown made statements in open court that "Y'all are having a Trial, there is no need for me to take the stand ... I have no Lawyer here" and "You are trying a case; but not me ..." Accordingly, Brown did not testify in his own behalf, there was only perfunctory defense, and the jury found him guilty of murder in the first degree. [424 F.2d at 1169.]

A defendant, of course, need not go to these lengths to obtain a colloquy with the court on his dissatisfaction. It is clear, however, that Iles' silence was insufficient to warrant an inquiry into whether he could demonstrate "good cause" for substitution of counsel.

■ Iles similarly argues that the district court abused its discretion in appointing Makley because he and Makley were embroiled in irreconcilable differences. The entire record belies any such contention. To the extent that this argument bears upon the district court's duty to inquire during the trial, we conclude that the record reflects that Makley and Iles communicated extensively. Not only did Iles testify at trial, but his testimony and Makley's direct examination fill more than a volume of the trial transcript. Further, the record is replete with references to Makley's discussions with the defendant, either privately or on the record.

One example of the extensive communication in this case occurred when the issue of whether Iles intended to waive his Fifth Amendment rights arose. When the district court questioned defense counsel on this issue, the following discussion ensued:

> MR. MAKLEY: Your Honor, I have gone over in great detail on many, many occasions with my client all of his rights under the Constitution. In particular, I have gone over with him the fact that he has the right and privilege not to take the stand and testify in this case or to incriminate himself in any way.... Mr. Iles, after my various conversations with him over a period of many weeks, has insisted that he wishes to testify on his own behalf in this case, to waive those privileges as I explained them to him.... It is not the intention of Mr. Iles or myself to indicate to this Court that he is only taking a partial waiver at this time by testifying concerning these [shelter promotion] tapes.
>
> THE COURT: I would ask for the record, Mr. Iles, is the representation of your counsel, Mr. Makley, correct?
>
> THE DEFENDANT: That is correct, Your Honor.

[Trial transcript at 1588–89.]

The record does show that Iles and his counsel periodically disagreed over how the defense should be conducted. We cannot say that the district court should have inferred from this, however, that the defendant wished to replace his counsel. Further, the district court unequivocally indicated that the court would consider any dispute between the defendant and his counsel. On the fourth day of trial, for example, Makley advised the court that Iles wanted to conduct what he thought was ill-advised cross-examination. [Transcript

of November 5, 1987 in-chambers conference, at 462–63]. As a means to addressing potential problems, the district court suggested the following procedure:

> THE COURT: I think the best thing to do is to bring you up to a sidebar when something like this comes up and you explain to me the problem, the question he asked, and maybe I can explain to him if he's asked that question it will open up a Pandora's box that will bring up testimony of a witness that can be against him. [Transcript of November 5, 1987 in-chambers conference, at 464.]

This never became an issue, however. In fact, after two Government witnesses testified, the district court addressed defense counsel at a sidebar:

> THE COURT: I'll send the jury upstairs for the recess now. And if you want me to talk about this cross-exam with your client, I'll leave it up to you if you think it is the appropriate time to do it.
>
> MR. MAKLEY: At this point I'm not sure it's necessary. I explained to him I had a conversation with the Court and I explained to him what we talked about, and I explained to him what we were going to do in terms of making a professional judgment about whether or not a witness would be cross-examined and what questions would be asked. I also

told him that if he had any problem with what questions we asked or the nature and extent of the cross-examination, that he should tell me, and that if he did we would then take it up with the Court. On these two witnesses he did not indicate that he was dissatisfied. [Transcript of November 5, 1987 in-chambers conference, at 495.]

The defendant certainly was informed that the district court would address any disputes between him and his counsel as they arose.

Iles had many opportunities to make his dissatisfaction known, through counsel and personally. The defendant never lodged a complaint against his attorney, either during the pretrial proceedings or during the trial. The district court addressed the defendant many times—not only while he was on the witness stand but in several discussions outside the hearing of the jury. Iles played an active role in representing himself, as evidenced by his lengthy testimony. The district court also discussed with Iles on several occasions, out of the hearing of the jury, his wish to present several video tapes to the jury and the procedure for doing so. [*See* trial transcript at 1512–14, 1589–90]. If the defendant was dissatisfied with counsel, he had ample opportunity to make that dissatisfaction known.[10]

---

10. In perhaps one telling instance, Iles was presented with an opportune moment to state his dissatisfaction with counsel. In an *ex parte* hearing held on November 12, 1987, the eighth day of trial, the district court reviewed defense witness lists to determine whether to issue subpoenas at the Government's expense. The record shows Iles and Makley had some disagreement over the relevancy of some of the witnesses' expected testimony. After the district court and Makley discussed which witnesses should be subpoenaed, the following occurred:

> MR. MAKLEY: And, Bob [Mr. Iles], if I left anything out, if I misstated anything or misrepresented anything in any way that you disagree with—
>
> THE DEFENDANT: *Without creating any conflict or indication of such,* there has been a number of witness lists furnished to [Makley's law firm] on various occasions.
> . . . .
> THE DEFENDANT: And we have been attempting to get these witnesses talked to since we furnished the list over a period of time.

> We have had our problems. I don't want to get into that.
>
> MR. MAKLEY: I concede, Your Honor, a number of names have been furnished to me and weeks and months passed and, in fact, Mr. O'Brien and myself spent one entire month doing nothing but driving around trying to find people and calling people on the telephone, and I don't recall the exact number of people we attempted to reach off of that list but I'm sure it was upwards of a couple of a dozen individuals, and they included such people as Mr. Southgate, who was talked to, Mr. Nay who was talked to, Mr. Cohen who was talked to, and many other individuals that we interviewed of the ones that we could find and locate and who would talk to him the period preceding the trial. And I think those are the names you're talking about; right?
>
> THE DEFENDANT: (Nodding head affirmatively.)
>
> MR. MAKLEY: The names here on this list, with the exceptions of Graham, Sacher and Moore, are names that are all new to me.

Iles has not demonstrated that the district court interfered with his Sixth Amendment rights on this issue.

### V.

One issue causes us concern. There is a serious question as to whether Iles was in fact indigent. There has been no showing in the record, other than an unverified and unsubstantiated representation, that Iles was unable to afford counsel. A finding that Iles was not, in fact, indigent would not bode well for his arguments on appeal. If Iles truly was dissatisfied with appointed counsel, he could have used his own resources to replace him.

Not only was Iles represented by Makley and his associate, O'Brien, but it appears that his appellate counsel, Robert Grossman, also had a *paid* role in his defense. We recognize that Grossman was not formally admitted as co-counsel until December 10, 1987, which was after the jury verdict. Grossman apparently was admitted so that he could argue a motion for release from custody on behalf of Iles and to participate in any matters up to the appeal.

While Grossman purports merely to have been engaged as an expert witness to testify in the case, he appears to have had a far larger role in Iles' representation. Grossman, in fact, was present at the October 8, 1987 hearing regarding the appointment of Makley. Judge Spiegel understandably inquired as to his interest in the case:

THE COURT: All right. Now, I know counsel from Washington is here. Is there anything you wish—you want to enter an appearance or just advise the Court you're here and what your interest at all is in this case, because I believe you called my chambers yesterday.

MR GROSSMAN: I did. My name is Robert D. Grossman, Jr., Your Honor. I was—I have met with Mr. Iles in my

Washington office last week. We do tax work in Washington, D.C. I was a former member of the Internal Revenue Service Tax Court Litigation Trial Branch for four years where I was a Senior Trial Attorney. For the past 12 years I have been practicing tax law in Washington. I have a Masters Degree in taxation from New York University. I was retained to be an expert witness and assist his counsel, Mr. Makley, with the development of the case and if need be to testify on his wife's behalf or consider expert testimony on the Government's behalf. Rather than being involved in his representation, I would be assisting him in terms of an expert witness at this trial, and I did call the Court's chambers to find out when there was a setting in this matter this morning so I could be here. [Transcript of the October 8, 1987 hearing, at 15.]

When the matter of Makley's withdrawal arose before Judge Spiegel, Grossman actually approved of the trial judge's decision to permit Makley to continue as counsel. Grossman's role was also clarified in the following exchange:

THE COURT: Mr. Grossman, I wasn't sure whether you were here in taking over representation of Mr. Iles because of the obvious conflict that Mr. Makley felt when he was representing both of them. You will be cooperating with Mr. Makley and assisting Mr. Iles in his defense of this litigation?

MR. GROSSMAN: As much as possible. And I have had at least two long conversations with Mr. Makley on the telephone in an attempt to try to get some foundation of where his development of this trial is and what I might do to assist him. I might say, Your Honor, the conclusion the Court has come to this morning seems to be a Solomon-like decision in the sense you have an attorney who is most capable of representing the defen-

---

These are not the names that we previously were given but names of people that I never had any opportunity to talk to or know anything about before we got the list yesterday. [Transcript of the November 12, 1987 hearing, at Jt.App. 163–64 (emphasis supplied.)]

Iles' interest in not "creating any conflict or indication of such" is entirely inconsistent with his claim on appeal that he was embroiled in an irreconcilable conflict with Makley. The extensive communication at trial is persuasive proof.

dant and has the background of representing the defendant. [Transcript of the October 8, 1987 hearing, at 16.]

If there was any question as to whether Grossman participated merely as an expert witness, as he argues on appeal, this was quickly dispelled at Iles' sentencing hearing. At the sentencing hearing on May 13, 1988, Makley characterized Grossman's participation, while he was present:

THE COURT: Thank you. You know of any reason why sentence should not be imposed on the defendant at this time? Mr. Makley was the counsel of record in the trial of this case, so I'll proceed with you first, Mr. Makley.

MR. MAKLEY: No, Your Honor, I don't, and let me say by way of explanation I am still counsel of record, or co-counsel of record, mainly because of a pending motion for a new trial based on newly discovered evidence which I submitted some time ago and which is as of yet unruled upon.

The Court should know that the co-counsel in this case, Mr. Grossman, is the most appropriate counsel to address the Court regarding any statement on behalf of the defendant in connection with the sentencing.

As the Court may recall, Mr. Grossman appeared and testified as an expert witness during the trial on behalf of Mr. Iles. Mr. Grossman was also counseling with Mr. Iles prior to trial on his defenses in this case, even though he was not co-counsel of record. Indeed, he participated in certain plea bargain negotiations with the United States Attorney's Office prior to trial along with me.... [Transcript of the May 13, 1988 sentencing hearing, at 3–4.]

Although Grossman does not appear to have been present during the trial, other than the day of his testimony, his documented paid participation prior to trial and after the jury verdict certainly sup-

ports the district court's observation that Iles appeared to be attempting to manipulate the trial process.

Iles argues, however, that the issue of his indigency was not adjudicated.[11] Although it is true that the scheduled hearing was not held on this issue,[12] the district court had this to say in its May 13, 1988 order denying Iles' motion for a new trial:

During the course of the trial the defendant took the stand in his own defense and revealed that he and his wife had established a trust of valuable assets at or about the time many of the allegedly illegal transactions were occurring, which trust was for the benefit of and to protect his children. We concluded from the defendant's testimony that the trust was created in fraud of the defendant's creditors and ordered that the assets be frozen therein. Following the verdict we scheduled a hearing on the issue of the defendant's indigency and whether the trust and other assets of the defendants should continue to be frozen. Following sentencing we ordered the government to show cause why our order preventing distribution from certain accounts of the defendant should not be vacated. On February 1, 1988, the Court was advised that agreement had been reached between defendant, his counsel and the government, to the effect that counsel appointed to represent the defendant as well as his wife would be paid by the defendant apparently from the assets of the trust and we entered an order unfreezing the assets of the defendants.

The purpose of the foregoing recital.... is to point out that the defendant was not indigent and without resources as he seems to imply in his motion for a new trial.... [Memorandum and Order dated May 13, 1988, at 2–3.]

It is perhaps sufficient to note that the trust included, among other assets, stock in

---

**11.** In his reply brief, however, Iles acknowledges that Grossman was retained, at least for the period prior to trial, for his expert witness testimony, and for the period following the verdict.

**12.** On December 2, 1987, the Government filed a motion for a hearing on Iles' indigency and for an order freezing defendant's assets. On the same day, the district court froze all assets owned or controlled by Mr. and Mrs. Iles.

Iles' various corporations, a house, a limousine, a Rolls Royce, and a jet airplane.

Iles' other actions in the district court also are inconsistent with his claims of indigency. When the issue arose regarding Iles' custodial status following the jury verdict, for example, Iles stated that he was willing to post bond out of the trust. [Trial transcript at 2179.] Even setting aside these considerations which suggest Iles' attempt to manipulate the trial process, we are convinced that the district court did not violate his Sixth Amendment rights on these issues.

## VI.

One last argument remains. Iles also argues that he was denied effective assistance of counsel. We decline to address this claim since Iles did not first present it to the district court. *See United States v. Swidan,* 888 F.2d 1076, 1081 (6th Cir.1989); *United States v. Hill,* 688 F.2d 18, 21 (6th Cir.1982) (per curiam).

Accordingly, for the reasons stated above, we AFFIRM the district court's judgment, without prejudice to the defendant to raise his ineffective assistance of counsel claim in a proper post-conviction proceeding.