**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Gregory Ferl JUSTICE, Defendant–Appellant.**

**No. 00–1075.**

United States Court of Appeals,
Sixth Circuit.

June 25, 2001.

Before RALPH B. GUY, JR., NORRIS, and GILMAN, Circuit Judges.

PER CURIAM.

Defendant, Gregory Ferl Justice, was convicted by a jury on six counts of bank robbery in violation of 21 U.S.C. § 2113(a). The charges involved six separate robberies occurring from February 1996 through November 1998. Defendant was sentenced to 121 months' imprisonment, to be followed by a two-year term of supervised release. Defendant argues that the district court abused its discretion (1) by denying his request for appointment of new counsel and (2) by allowing the government to offer testimony from two witnesses who were not disclosed on the government's witness list. After careful review of the record and the arguments

presented on appeal, we affirm defendant's convictions.

## I.

Defendant was originally indicted in February 1999 on three charges of bank robbery. Three more charges were added in June 1999, after a surveillance photograph was published in the newspaper. All of the robberies occurred in and near Dearborn, and all took place within a short distance from the defendant's workplace. Defendant worked the afternoon shift as a cleaner or janitor at the Ford Research and Engineering Center in Dearborn, Michigan. Defendant lived in Lincoln Park, Michigan.

On February 23, 1996, a man walked into the First of America Bank in Allen Park, Michigan; handed a note to one of three tellers; demanded "100s"; and robbed the bank of $3,120. Karen McGowan, a bank employee who witnessed the robbery, testified that she watched as the man wearing a burgundy polyester suit and a knit cap walked across the parking lot and entered the bank. The demand note, written in block letters, read:

> If you push the alarm buttons or do *any thing* out of the ordinary I will detonate the *3 plastic explosives (C–4)* which will *level this instit[ut]ion with one push* of the det[o]nator which is in my pocket. I have one plastic explosive (C–4) on my person and one by the window and another by the door. I have AIDS so I'm ready to die quickly so don't be hero if you want to see another day. *No die packs. I better see a stack of $100s or kiss your ass goodbye.*

McGowan identified defendant from a line-up and testified at trial that the defendant was the man who robbed the bank that day.

On June 18, 1996, a man walked into the Melvindale Community Credit Union in Melvindale, Michigan; presented a block-lettered demand note to a teller; and robbed the credit union of $1,200. April Thomas, who was working on her computer when the man slid the note through her window, described the man as wearing a grey suit coat, a blue baseball cap with red writing on it, and metal-framed glasses. She thought he was between 5′ 8″ and 5′ 10″ tall. The demand note read:

> I have 3 plastic explosives (C–4) which I will det[o]nate if you make any unordinary movements or push any alarms. I can detonate them from a ¼ of a mile away so don't kiss your ass good bye from this world. I have AIDS so I don't have anything to lose. Do you? *No dye packs I better see a stack of $100.00* bills or this *place will be a parking lot* within *6 seconds. Give this note* back now. I'm not playing, we can go to hell together.

Thomas identified defendant both at a line-up and during trial. Another teller also identified defendant as the robber.

On December 31, 1997, the NBD Bank in Dearborn, Michigan, was robbed at about 2:45 p.m. by a man who pushed a note through a teller window and robbed the bank of $700. The teller, Kim Britt, testified that the robber was about 6′ tall, was wearing a stocking cap and ski jacket, and had a rugged, scruffy looking face. The demand note read:

> Don't move or push any alarms or I will unload my two pistols. You only have 3 seconds to give me a stack of $100.00s and $50.00. *No dye packs.* I work at a bank so I know what they look like and I'm going to check. Don't give me a reason to start shooting.

Britt identified defendant as the robber during trial, but was not able to identify him from a photographic or corporeal line-up. Another teller, who saw the robber for a few seconds from a distance of about

two feet, identified defendant from a photospread and at trial.

On October 9, 1998, a man went into a branch of Comerica Bank in Detroit, Michigan; handed a block-lettered note to a teller; and robbed the bank of $934. The teller, Patricia Guinan, described the robber as 35 to 40 years of age, about 5′ 6″ tall, with deep-set dark eyes, and kind of sunken cheeks. He was wearing glasses, a jacket, and a straw hat. The demand note read:

> Don't move or say a word or I will *start shooting everyone. No dye packs.* I will check. I know what they look like so don't make me unload my weapons. *Give me a stack of $100s $50s. Now.* I have nothing to lose.

The teller identified defendant as the robber both at a photospread and during trial.

On November 6, 1998, a man went into a branch of Comerica Bank located in Dearborn, Michigan; gave a block-lettered note to a teller; demanded money; and robbed the bank of $3,460. The demand note read:

> You better *not move* or *make any unordinary moves* or I will *start shooting. You have 3 seconds* to give me $100.00 $50.00s. No dye packs or no fuckin security packs. I'm going to check if they are you can kiss you ass goodbye *first.* Give my note back now.

The teller, Veronica Roesly, identified defendant at trial and picked him out of a corporeal lineup. She testified, consistent with her earlier description, that the robber had blue eyes. Defendant's eyes are actually brown.

Finally, on November 25, 1998, a man walked up to a teller window at another branch of Comerica Bank in Dearborn, Michigan; slid a note under the glass; demanded money; and robbed the bank of $2,715. The hand-written note read:

> Don't speak or make any movements or you can *kiss your ass* goodbye and *any*

one *around you will go down too.* I have 2 automatic weapons with armor p[ie]rcing bullets that will go thr[ough] 4 inches of steel *so don't make me start shooting.* You have *only 3 seconds to give me a stack of $100 & $50.00* unmarked bills. I better not see a *dye pack when I check when you give me* the money. No security or no dye packs if you know what good for everyone around here. *My partner is behind me.*

The teller, Sandra Clark, identified defendant at trial and from a photospread. Bank surveillance photographs of this robbery showed the robber wearing a white jacket with distinctive markings, including a dark stripe going halfway down the back of the jacket.

When agents searched a janitorial closet at defendant's workplace that had been assigned to him, they found a plastic bag stuffed into a crawlspace. The bag contained, among other things, a white windbreaker with markings that matched the jacket worn by the robber on November 25, 1998. A few other items of clothing and shoes similar to those worn in other robberies were found in the searches of defendant's residence and his car.

Defendant gave notice of an intention to offer an alibi defense, claiming that he was at work at the time of at least some of the robberies. The government called two of defendant's supervisors, who testified that defendant did not work on the dates of the first four robberies. On the dates of the last two robberies, however, the attendance records showed that defendant had checked in at work.

Defendant's supervisors testified that although the cleaners checked in at the beginning of the shift and went about their work, it was fairly easy and common for cleaners to leave the premises. In fact, defendant had been caught leaving the premises several times. An agent testified

that he traveled to and from defendant's workplace to the locations of the last two robberies. The trip to and from the bank that was robbed on November 6, 1998, took nine minutes, including several minutes spent inside the bank. It took a total of thirteen minutes to make the round trip to and from the bank that was robbed on November 25, 1998, again including several minutes spent inside the bank.

On the first day of trial, defendant requested that new counsel be appointed to represent him. The district court denied the motion, trial proceeded, and the jury convicted defendant on all counts. During trial, the government offered the testimony of two witnesses concerning whether defendant had blue colored contact lenses. The district court allowed the evidence over defendant's objections, but adjourned the trial to afford defendant an opportunity to meet the testimony of the second witness. Defendant was sentenced on January 14, 2000, and this timely appeal followed.

## II.

A. Request for New Counsel

■ This court reviews a district court's denial of a motion for substitution of appointed counsel for abuse of discretion. *See United States v. Iles*, 906 F.2d 1122, 1130 n. 8 (6th Cir.1990). The court in *Iles* explained "that '[w]hen an indigent defendant makes a timely and good faith motion requesting that appointed counsel be discharged and new counsel appointed, the trial court clearly has a responsibility to determine the reasons for defendant's dissatisfaction with his current counsel.' " *Iles*, 906 F.2d at 1130 (citation omitted). At the same time, there is no right to have appointed counsel of one's choice and therefore an indigent defendant must demonstrate good cause to warrant substitution of counsel. *See United States v. Williams*, 176 F.3d 301, 314 (6th Cir.1999);

*United States v. Jennings*, 83 F.3d 145, 148 (6th Cir.1996).

■ A reviewing court generally considers the following factors in determining whether the denial was an abuse of discretion: "timeliness of the motion; adequacy of the court's inquiry into the defendant's complaint; and whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense." *Iles*, 906 F.2d at 1130 n. 8. In addition, the court must balance these factors with the public interest in the "prompt and efficient administration of justice." *Id.* (citation and internal quotation marks omitted). *See also Williams*, 176 F.3d at 314; *Jennings*, 83 F.3d at 148.

On September 7, 1999, the date set for trial, defense counsel began by indicating to the court that the defendant had advised him that morning that he wanted new counsel appointed to represent him. The judge addressed defendant directly and the following exchange occurred:

THE COURT: Will you explain your position?

THE DEFENDANT: Sir, I feel there's been a breakdown in communication between Mr.—

THE COURT: What is the nature of the breakdown?

THE DEFENDANT: Well, it just seems I haven't had enough time with him to discuss all of my issues with him. He's been my attorney for nine months now.

THE COURT: Pardon?

THE DEFENDANT: He's been my attorney for nine months now, and I haven't had enough time to discuss all of my issues in detail. I haven't had enough time.

THE COURT: You've been here twice. You were here on August 30th, and you were here on an earlier date.
....

... and neither time did you discuss with me or make any indication that you were dissatisfied with your counsel. Indeed, he rather vigorously represented you.

And on August 30 we had an extended discussion. It seemed to me that [your counsel] was fully familiar with the file, was aware of all of the consequences of the case and fully prepared to proceed. So it seems to me that we should begin the trial. There's a jury upstairs waiting....

You were here on July 29th and August 30th, and indeed on August, 30th at the conclusion of the hearing I believe the record will reflect I asked if this case was really going to trial.

The prosecutor commented that many of the witnesses he had interviewed in preparation for trial had also been contacted by an investigator on behalf of the defendant. The district court concluded that the defendant had made an inadequate showing under the circumstances to warrant the appointment of new counsel and denied defendant's motion.

Defendant argues that the district court abused its discretion by failing to make an adequate inquiry into the defendant's complaint of a breakdown in communication with his appointed counsel. On the contrary, the district court directly asked the defendant in open court what was the nature of the breakdown in communication. Defendant's articulated complaint did not suggest a serious conflict or inability to communicate that would demonstrate good

cause for substitution of counsel. In addition, the district court had heard defendant's earlier motions to suppress and was aware of defense counsel's knowledge of the case. Further, the untimely nature of defendant's request also weighed against the appointment of new counsel.[1]

In support of the claim of a breakdown in communication, defendant points to the district court's reference to "stresses between defense counsel and his client." That comment, made on what would have been the last day of trial, followed defense counsel's objection to the government's attempt to call a second unannounced witness to testify about records from the Hudson's optical department. Debating whether to allow the evidence or continue the case another day, the district court was concerned that an adjournment for that reason would put defense counsel in a difficult position because the court had denied defendant an adjournment to allow for the appointment of new counsel. The district court's concern in this regard hardly demonstrates that defendant had shown the necessary good cause to warrant substitution of counsel. After review of the record and consideration of the relevant factors, we cannot find the district court abused its discretion in denying defendant's request for new counsel.

### B. Government's Unannounced Witnesses

During trial, the district court permitted the government to offer the testimony of two witnesses who had not been included on the pretrial witness list. Both witnesses offered testimony concerning defendant's desire for and purchase of colored

---

1. Defendant's reliance on *United States v. Welty*, 674 F.2d 185 (3d Cir.1982), to require an *ex parte* inquiry into defendant's request for new counsel is misplaced. Not only did the district court fail to make even a minimal inquiry into the request for new counsel in *Welty*, but also the denial of the motion resulted in defendant's decision to waive his right to counsel and proceed *pro se*.

contact lenses. Roesly, the teller who was robbed on November 6, 1998, testified that the robber had blue eyes. Defense counsel cross-examined her on this discrepancy in an effort to undermine her identification of the defendant.

The government then offered the testimony of Yolanda Boehmer concerning defendant's desire to get colored contact lenses. Boehmer testified, over defense counsel's objection, that she knew defendant socially in 1995 and 1996; that they had discussed getting colored contact lenses; and that she had seen him wearing blue contact lenses sometime in late 1996 or early 1997. Defendant's objection was that Boehmer was not included on the pretrial witness list.

On Friday, September 10, 1999, which would have been the last day of trial, the government sought to present evidence obtained the previous day from the optical department at Hudson's Department Store at the Fairlane Town Center in Dearborn, Michigan. Patricia Schultz, the manager of the optical department, was prepared to identify records showing that a Gregory Justice purchased sapphire-blue, hazel, and jade-green contact lenses in October and November 1996. Defense counsel objected to the surprise witness, raised a concern about possible physician/patient privilege, and indicated that he had no opportunity to prepare for the testimony.

Having indicated to the jury that the case would be submitted to them that day but unwilling to allow the testimony without affording defense counsel an opportunity to prepare, the district court was initially inclined to exclude the evidence. The prosecutor described the evidence, which the district court agreed was competent and relevant, and explained

we have diligently sought these records. They have been difficult to find because we didn't know where the defendant got his optical services, and it took a long time to track that down. I did not receive these records until this morning . . . because we had to subpoena them to get them, and we didn't know who to direct the subpoena to until yesterday when we received information from an insurance carrier pursuant to subpoena that led us to these records. So we have been diligent in obtaining these records, and as soon as I had them, I gave them to [defense counsel] when I came over this morning.

The district court ultimately determined that the government could present the newly obtained evidence and adjourned the trial until Monday, September 13, 1999.

 First, as defendant concedes, a defendant in a non-capital case is not entitled to know in advance of trial who will testify for the government. *See United States v. McCullah,* 745 F.2d 350, 353 (6th Cir.1984). Recognizing this, defendant argues on appeal that the late notice concerning the optical department's records was unfairly prejudicial because the evidence was obtained through the improper use of a trial subpoena issued in violation of Fed.R.Crim.P. 17(c). Defendant did not object to the evidence on this basis, however.[2]

 Rule 17(c) authorizes the issuance of a subpoena for the production of documentary evidence at trial, but is not intended to be used for discovery. *See United States v. Nixon,* 418 U.S. 683, 702, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Rule 17(c) also provides that the court may direct pretrial production of documentary

---

**2.** In fact, we have questioned whether a defendant has standing to challenge the validity of a subpoena issued under Rule 17(c) to a

third party. *See United States v. Compton,* Nos. 93–1649/93–1712, 1994 WL 328303, at *3, 28 F.3d 1214 (6th Cir. Jul.1, 1994).

evidence. A subpoena *duces tecum* must be reasonable, specific, and the documents requested must be relevant. *See United States v. Kalter*, 5 F.3d 1166, 1169 (8th Cir.1993) (citing *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 n. 5, 71 S.Ct. 675, 95 L.Ed. 879 (1951)). If a motion to quash had been made, the decision would be left to the district court's discretion. *See United States v. Hughes*, 895 F.2d 1135, 1145 (6th Cir.1990).

In this case, the government represents that the trial subpoenas used to obtain the optical department's records did not require pretrial production of documents but were made returnable for September 10, 1999, the day that the government offered the evidence. Thus, defendant has not shown any error in the issuance of the subpoena. In fact, even if the court had been required to direct the production of the evidence, the district court recognized the likelihood that the evidence was competent and relevant. Further, given the testimony that defendant had expressed an interest in getting colored contact lenses and had been seen wearing blue contact lenses, the request for records to confirm that Gregory Justice had purchased colored contact lenses would not suggest an improper "fishing expedition." Under the circumstances, defendant has failed to demonstrate an abuse of discretion in the admission of this evidence.

AFFIRMED.