OPINION
On April 21, 2000, the Franklin County grand jury returned a thirty-count indictment naming both Richard Rowland and Kimberly Kendall[1] as defendants. Twenty-four of the counts pertained to alleged acts of rape against Ms. Kendall's young daughters. The remaining counts alleged various acts of kidnapping and gross sexual imposition, with the same named victims. Given the particular facts alleged, some of the rape counts carried potential life sentences.
The indictments arose as a result of numerous allegations of sexually violent assaults by both Kendall and Rowland. As the discussion of facts below reveals, Ms. Kendall would variously participate either directly by actively abusing the girls herself, or would assist Rowland while he was abusing her daughters by holding the child down and/or demanding compliance with Rowland's wishes.
The alleged abuse was initially reported to law enforcement officials when the younger of Kendall's daughters, Amber, was taken to a hospital after being hit by a truck on Beggars' Night of 1999. At some point during her treatment at the hospital, Amber told a nurse that she had been sexually abused. The prosecution ultimately alleged instances of ongoing abuse from April 1994 through October 1999. The specifics of the alleged abuse are discussed below in detail, as required by Mr. Rowland's latter assignments of error.
A jury trial commenced in November 2000. Prior to trial, the state sought an order of nolle prosequi as to several counts of the indictment. At the close of the state's case, defense counsel made a Crim.R. 29 motion for acquittal as to several counts; as a result, the state dismissed five counts. By the end of the trial, the jury was left to consider nineteen counts.
On December 6, 2000, the jury returned guilty verdicts on the remaining counts — eighteen counts of rape and one count of kidnapping. With respect to certain rape counts, the jury also made specific findings of force and that the victim was less than thirteen years of age. The court ordered preparation of a presentence investigation report and scheduled the matter for sentencing.
A sentencing hearing was conducted on February 2, 2001. Pursuant to a sentencing entry journalized February 28, 2001, upon application of the prosecution, the court ordered that a nolle prosequi be entered for eight counts of the indictment. As is statutorily required as to the most serious rape convictions, the court sentenced Mr. Rowland to five life terms, with two terms to be served consecutively to the first, and two terms concurrently. With respect to the remaining fourteen convictions, the court sentenced him to nine-year-terms on each, six of them consecutive and eight concurrent.
The trial court also determined that Mr. Rowland should be classified as a sexual predator, which finding is not contested here.
Richard Rowland (hereinafter "appellant") has timely appealed, assigning four errors for our consideration:
Assignment of Error One
 The trial court denied the appellant's request for new counsel thereby violating his right to counsel, due process rights and a right to a fair trial as guaranteed by the United States and Ohio Constitutions.
Assignment of Error Two
 The trial court erred by sentencing the appellant to the maximum consecutive sentences.
Assignment of Error Three
 The verdict is against the manifest weight of the evidence and the trial court erred in finding appellant guilty. This denied appellant a fair trial and due process of law as guaranteed by the United States Constitution and Article I, Section 10 of the Ohio Constitution.
Assignment of Error Four
 There was insufficient evidence to convict appellant. This denied appellant of his right to a fair trial.
Appellant's third and fourth assignments of error collectively challenge the sufficiency and weight of the evidence as being inadequate to sustain the verdicts in this case. In the body of his arguments in support, appellant attacks only some of the plethora of sex offenses of which he was convicted. Since both assignments of error require a recitation of the facts as adduced at trial, we discuss them first and jointly.
Preliminarily, we set forth the well-established standards by which we are bound in reviewing these alleged errors. The respective standards of review are similar, yet distinct.
"The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. In Thompkins, the court explained at length the distinctions between the two standards:
 With respect to sufficiency of the evidence, '"sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486 * * *. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, * * * citing Jackson v. Virginia (1979), 443 U.S. 307 * * *.
When reviewing the sufficiency of the evidence to support a conviction, an appellate court must review the record to determine "whether the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. In Jenks, the Supreme Court set forth the stringent standard of review to be applied in a sufficiency analysis:
 "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
In contrast, as explained in Thompkins, supra, a manifest weight analysis is slightly different:
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487 * * *. Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a '"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42 * * *. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175 * * * (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.').
Pursuant to the foregoing standards, we examine the record in a light most favorable to the prosecution to determine if the prosecution sufficiently proved beyond a reasonable doubt each element of the offenses at issue, and/or whether the jury "lost its way" in convicting appellant such that a manifest miscarriage of justice occurred.
Returning to appellant's assignments of error, he contends that the prosecution failed to prove by sufficient evidence the elements of the sex offenses of which he was convicted. As indicated infra, appellant further contends that the verdicts were against the manifest weight of the evidence.
Rape[2] is proscribed by R.C. 2907.02(A), in pertinent part, as follows:
 (1) No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies:
* * *
 (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
* * *
 (2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.
For purposes of the rape statute, "sexual conduct" is defined by R.C. 2907.01(A) as follows:
 "Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.
Rape is a felony of the first degree. Pursuant to R.C. 2907.02(B), if the offender under provision (A)(1)(b), purposely compels a child victim to submit by force or threat of force, the mandatory penalty is imprisonment for life.
Although appellant does not specifically address his kidnapping conviction, we nonetheless review it as well. As is relevant here, the elements of kidnapping are set forth in R.C. 2905.01(A):
 (A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
* * *
 (2) To facilitate the commission of any felony or flight thereafter;
 (3) To terrorize, or to inflict serious physical harm on the victim or another;
 (4) To engage in sexual activity * * * with the victim against the victim's will.
Applying the foregoing to the facts of this case, the prosecution presented the following evidence at trial.
The state's first witness was Amber Mansperger, the younger of the two sisters/victims in this case. Amber, age fifteen at the time of trial, testified that she had been abused by appellant for approximately six years when she finally felt safe enough to tell a nurse about it at the hospital. This occurred on October 28, 1999, after Amber had been hit by a truck, which resulted in a broken pelvis. After Amber told a nurse, she repeated the same allegations to others, including another nurse and a detective. Although Amber ultimately identified appellant as the rapist, she was initially too scared to tell the detective about her mother's involvement. (Tr. 42; 78.)
The abuse purportedly began when Amber was eight years old. She testified that in April 1994, appellant came into the bathroom while she was taking a shower. His penis was exposed. He took a jar of Vaseline out of the medicine cabinet and rubbed some on her vagina. He was only able to partially insert his penis into her vagina. According to Amber, it was painful, causing her to cry and kick so hard that she kicked a hole in the wall. Amber claimed that she was afraid to tell her mother what had happened because she was scared. "He told me that he would hurt me," according to Amber. Also threatening to Amber was her knowledge of appellant's tendency to carry weapons, particularly a knife and a holstered gun. (Tr. 48-52.)
Approximately two to three months later, Amber's mother came to Amber's room, telling her daughter to help her put appellant "in a good mood." Ms. Kendall then took Amber into the couple's bedroom and locked the door. Appellant was naked and pretended to be asleep. Amber was first forced to watch her mother perform fellatio on appellant; her mother then forced Amber to perform fellatio on him. This continued until Amber made herself sick, and threw up in a nearby trash can. Her mother eventually unlocked the door so that Amber could get out. There were "a couple," at least two, similar incidents that same week. Amber was nearing her ninth birthday by this time. (Tr. 53-64.)
Between Thanksgiving and Christmas of the following year, Amber was ten years old when appellant raped her again. According to Amber, appellant came in to the bathroom, naked, and took off Amber's clothes. He completely inserted his penis this time, causing her to bleed and cry. He told her that it would "only hurt for a second." (Tr. 65-69.)
On October 10, 1999, appellant forced Amber to go with him to Decker Motors, a used car dealership where appellant had worked, which was closed at the time. He made her go to a bedroom in the back of the room. Her told her to take off her clothes. Appellant was carrying a gun at his side. He took off his pants, pinned her arms over her head, vaginally raped her and ejaculated into a towel. (Tr. 70-77.)
On cross-examination, Amber acknowledged that in 1992, she accused another man of molesting her. She believed that this man was still serving a prison sentence as a result of her allegations. She also admitted lying to a detective and lying in a juvenile court proceeding regarding her mother's involvement in the sexual abuse. According to Amber, she was afraid that her siblings would hate her if she implicated their mother. (Tr. 90; 110.)
After appellant was arrested, he made a collect phone call from jail to his son, Richard Rowland, III, who was working at Decker Motors at the time. According to his son's testimony, appellant asked him to go to the bedroom at Decker Motors, tear off the sheets and blankets from the bed, and tell his mother to wash them "immediately." (Tr. 282.) Debra Timson, appellant's former wife and the mother of Richard Rowland, III, confirmed her son's testimony. (Tr. 299-300.) Neither of these witnesses was aware of the abuse allegations until after appellant called his son with the request to have the bedding washed.
Kathleen Geles was a nurse who treated Amber after the auto accident on Beggars' Night, 1999. Although Amber was in pain due to a fractured pelvis, Amber seemed most "agitated" about "if we thought she was pregnant." After Amber reported that she had been sexually abused, Ms. Geles summoned the police and reported the allegations. (Tr. 115-120.)
Columbus Police Officer Remus Borcila responded to the scene of the accident and followed Amber to the hospital shortly thereafter. Upon his arrival, a nurse approached him to report Amber's allegations. As a result, the officer reported the matter for further investigation to Detective James Tripp of the police juvenile bureau. Officer Borcila, awaiting the detective's arrival, was told by Amber that she did not want to see appellant, who showed up at the hospital soon after Borcila did. The officer was present when someone told appellant about Amber's allegations. According to Officer Borcila, appellant "seemed surprised" and denied any wrongdoing on his part, and denied knowledge of any wrongdoing by anyone else. When the officer told Amber that he was going to discuss the matter with her mother, Amber "was very hesitant * * *, she was very concerned and scared." Amber told the officer that she did not want him to tell her mother. (Tr. 123-127; 129-131.)
Gail Hornor, a pediatric nurse practitioner at Children's Hospital, testified regarding her examination of Amber on December 2, 1999. As a routine question, Ms. Hornor asked Amber if she had ever engaged in consensual sex; Amber said that she had not. According to Ms. Horner, the physical examination revealed that Amber's hymen had been torn "all the way through to the floor of the vagina." The physical examination was consistent with the history of abuse provided by Amber. (Tr. 137-142.)
Gina French, M.D., testified regarding her earlier examination of Amber at Children's Hospital back in July of 1992. Amber had allegedly been sexually assaulted by some man named "Bill," who reportedly lived in the same house with Amber. Kimberly Kendall took her daughter Amber to the hospital on that day. During that examination, Amber denied being molested by anyone. Instead, Amber indicated that "her sister" had been molested. At that time, Amber's genitalia appeared to be normal and her hymen was intact. However, the doctor referred her to the hospital's clinic for suspected child abuse. (Tr. 148-157.)
Amber's older sister, Krista Mansperger, testified regarding the abuse she suffered when she sporadically resided with her mother and appellant in 1997 and 1998. Krista was seventeen years old when she went to live with the couple for the last time.
In July 1997, Krista's mother, Kimberly Kendall, asked Krista if she would lose her virginity to appellant and have his baby. Krista adamantly responded that she would not because appellant "was like a father" to her. Although her mother was angry, she did not say anything else to Krista about it for awhile. (Tr. 164-165.)
Approximately one week later, appellant asked Krista to come into the couple's bedroom. Her mother then came in, telling Krista that she was "going to sleep with [appellant] whether [Krista] liked it or not." When Krista refused to comply, appellant "grabbed [her] hair and made [her] have oral sex with him." During this incident, Krista was crying, and her mother stood at the foot of the bed. While appellant stripped Krista's clothes off, her mother held Krista's arms down. Ms. Kendall continued to hold her daughter's arms while appellant raped Krista. Appellant became angry when Krista started gagging, and he told Krista he would kill her if she screamed. After forcing her to perform fellatio, appellant put a condom on and vaginally raped Krista. It was painful and she begged him to stop. When the assault was over, appellant ordered Krista to take a shower. She believed appellant's threat that he would kill her because he repeatedly hit her mother, and he always had a gun and knife with him or near him. (Tr. 167-172.)
According to Krista, appellant repeatedly raped her vaginally and anally "at least every other night" during July or August of 1997. She tried to fight him off at first, but then "gave up because [she] knew there was no way for [her] to get away from him." (Tr. 173-179.)
Krista testified further that appellant also raped her at a motel. Appellant reportedly told her that he wanted "a change of atmosphere * * * for making love." During this assault, appellant told Krista that "when [she] was 18 [she] was going to take the place of [her] mother." When she said "no" and started to cry, appellant became angry, anally raped her, and then vaginally raped her. Later that year, appellant took her back to the motel. While she was showering, he went to an adult bookstore; when he returned, he gave Krista a "gift" a "dildo" in a brown paper bag. Krista again told appellant that she just wanted him to leave her alone, to which he again responded that he would kill her if she told anyone. Appellant then instructed Krista to "go to the mall so [she] could find a boyfriend and bring him back [to the motel] so [appellant] could watch" the two of them. Krista tried to leave; appellant grabbed her by the hair and shirt, and threw her on the bed. Appellant removed Krista's clothing and then used the dildo on her; specifically, he vaginally raped her with it. He then forced her to perform fellatio, and, finally, he forced her to have vaginal intercourse. Krista testified that appellant would occasionally perform cunnilingus on her as well, although she could not recall exactly how many times. She was certain, however, that appellant did so each time he took her to the motel. (Tr. 187-201.)
Each time they went to the motel, appellant signed a check-in card, paid cash for the room plus a deposit, and instructed Krista to stay overnight when he was through with her. In the morning, she was to check out, sign for the deposit, and use it to take a bus home. Krista identified State's Exhibit No. 1 as receipts from the motel, bearing both her signature and appellant's. (Tr. 201-203.)
After having nightmares and talking with her roommate, Krista finally went to the police to report what appellant had done to her. She was interviewed by Detective Tripp. Krista did not initially report what her mother had done, claiming fear that her siblings would be taken away from their mother. Krista admitted, as did Amber, that she had lied previously by not implicating their mother. Krista did, however, testify truthfully at her mother's trial. (Tr. 206-208.)
Detective James Tripp testified that Amber finally implicated her mother during his third interview with her. Krista did so during her second interview. The detective's testimony was generally corroborative of both girls' accounts.
Appellant called two witnesses to testify, in addition to testifying on his own behalf. These two witnesses were his brother and sister, who told the jury that appellant's then-wife, Debra Timson, commenced divorce proceedings after appellant was arrested. Ms. Timson then allegedly took thousands of dollars worth of items owned by appellant.
Appellant denied all of the allegations lodged against him by both girls. He claimed that he thought of Amber as a "daughter," since he had known her since she was two years old. According to appellant, he put Krista in a motel room only when she and her mother were fighting.
The state called as a rebuttal witness Jennifer Rowland, appellant's daughter. She generally characterized her father as physically and emotionally abusive, explaining how he would yell and scream at the children and call them names.
Appellant's argument in support of both assignments of error challenging the weight and sufficiency of a fairly voluminous record is, to say the least, concise. In approximately two pages of text in his brief devoted to these issues, he argues that the testimony of the victims is "not enough to sustain a conviction of the rape charges." He then attacks a few instances of the victims' respective testimony as not being specific or detailed enough to establish the elements of the offenses. We disagree.
Appellant mischaracterizes the evidence presented by the prosecution; the victims' testimony was not the "entire case." Notwithstanding some inconsistencies and other deficiencies in the girls' testimony, which are ultimately credibility issues to be resolved by the jury, the state presented other corroborating testimony, including testimony from hospital and police personnel tending to corroborate several of the more serious rape charges.
Although appellant apparently takes issue with the victims' failure to use the magic words "force" and the dictionary definitions of some of the acts which amount to rape to describe some of the attacks, the jury was certainly free to infer from the girls' graphically detailed testimony the substance of their accusations and that force was indeed involved.
We have thoroughly reviewed the record before us in its entirety. Given the state of this record, appellant's convictions were amply supported by sufficient evidence, and the convictions were not against the manifest weight of the evidence.
The third and fourth assignments of error are overruled.
By his first assignment of error, appellant contends that the trial court denied his request for new counsel and, in so doing, denied his constitutional rights to counsel, due process of law, and a fair trial.
A substitution of trial counsel first would have required a continuance of the trial. It is well established that "[t]he determination of whether to grant a continuance is entrusted to the broad discretion of the trial court." State v. Murphy (2001), 91 Ohio St.3d 516, 523, citing State v. Unger (1981), 67 Ohio St.2d 65. "Relevant factors include `the length of delay requested, prior continuances, inconvenience, [and] the reasons for the delay.'" Murphy, supra, quoting State v. Landrum (1990), 53 Ohio St.3d 107, 115.
In the context of seeking a continuance to have new counsel appointed, the Murphy court recently stated:
 Moreover, "[a]n indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate "good cause" to warrant substitution of counsel." United States v. Iles (C.A.6, 1990), 906 F.2d 1122, 1130, quoted in State v. Cowans (1999), 87 Ohio St.3d 68, 72 * * *. If his complaint is unreasonable, the trial judge may deny the requested substitution. State v. Deal (1969), 17 Ohio St.2d 17 * * *, syllabus. In evaluating a request for substitute counsel, the court must balance "the accused's right to counsel of his choice [against] the public's interest in the prompt and efficient administration of justice." United States v. Jennings (C.A.6, 1996), 83 F.3d 145, 148. "The trial court's decision is reviewed under an abuse-of-discretion standard." Cowans, 87 Ohio St.3d at 73 * * *.
Immediately before voir dire began, appellant addressed the trial court with his request for new counsel. The following colloquy occurred:
 [APPELLANT]: * * * I'm trying to find out if I could have different counsel.
 I asked [defense counsel] on several times to check on this and the other to help this case along and stuff like that, stuff with the witnesses, and stuff like that, but he has failed to do so.
 I don't feel actually like he is acting in my best behalf.
 THE COURT: So you're asking me to remove [defense counsel] from your case?
[APPELLANT]: Yes.
THE COURT: You want me to appoint another lawyer?
[APPELLANT]: Yes.
 THE COURT: This case, of course, has been continued several times and this court did appoint [defense counsel] to represent you. I think it's appropriate now to have [defense counsel] speak relative to his representation, his preparation.
* * *
 * * * I want to hear from you. I have had you in my courtroom a number of times and you have always acted professionally, and you have always been effective. I want to give you a chance to speak.
 [DEFENSE COUNSEL]: Your Honor, in this case there are lots of different issues going on. I have, with the court's approval, hired a private investigator and he has talked to a number of people.
* * *
 [The private investigator] * * * has always done a fine job for me.
 He had gone out and talked to a number of people, some of which were people that we got from discovery and some of the people were done at [appellant's] request, and none of these people, we feel, are witnesses and could assist in this case, one way or the other. So I do not intend to call those people for a variety of reasons that I don't want to get into right now, the merits of the case * * *.
 THE COURT: I don't think you should discuss your strategy or the merits of the case.
[DEFENSE COUNSEL]: That's correct, Your Honor.
 Your Honor, being a licensed attorney in the state of Ohio, I do have a pretty wide latitude in making professional decisions on how to conduct a case, and at this point, there's more of a disagreement with [appellant] as to how I approach the case strategically, and I think from my own professional opinion there are some people that [appellant] wants me to talk to who he believes might have seen or heard something. And that evidence would not be admissible and is not relevant or exculpatory and so I chose not to take the time of the investigator who we obviously are limited as to funds. And every time he goes to interview people, there is a cost, and we felt that these people would not provide exculpatory evidence, and * * * this is irrelevant evidence for this trial.
* * *
 * * * [I]n talking to [appellant], it is difficult to get him to try to focus on the real issues in this case.
* * *
 So it comes down to a matter of strategy and tactics as to how the case should be approached and to the way I prepared the case, and I believe that I have prepared the case well. We are prepared to start the trial this morning and I am ready to go forward. [Tr. 5-8.]
Defense counsel concluded by indicating that appellant had just given him the name of another witness, and counsel expressed his willingness to talk to that person.
The trial judge, first expressing his concern that the case had been continued "several times," confirmed with defense counsel that he was "prepared to effectively and professionally represent this gentleman today" and counsel again assured the judge that he was. (Tr. 8.) The judge was clearly satisfied that defense counsel had cooperated with appellant's wishes to the extent possible and/or necessary.
Appellant obviously was displeased with his counsel's strategy in preparing his defense. In Murphy, citing Lewis v. Alexander (C.A.6, 1993), 11 F.3d 1349, 1354, the Supreme Court of Ohio reiterated the established principle that "[d]ecisions about `the viability of certain defenses' are `within the exclusive province of defense counsel to make after consultation with his client.'" Murphy at 524.
Appellant has failed to demonstrate an abuse of discretion by the trial court in refusing to continue the trial again for purposes of substitution of counsel based solely upon appellant's apparent disagreement with counsel's trial strategy.
The first assignment of error is overruled.
By his second and final assignment of error, appellant contends that the trial court erred in ordering appellant to serve maximum consecutive sentences. Appellant's argument in support consists of four sentences; he makes the broad assertion that the trial court failed to comply with R.C. 2929.14 and 2919.19 when it imposed consecutive life sentences, in addition to the "near maximum" sentences of nine years on the remaining charges, without articulating the reasons for the sentences. With respect to the latter sentences, pursuant to R.C. 2929.14(A)(1), felonies of the first degree are generally subject to prison terms of three to ten years; as indicated infra, appellant was sentenced to nine years.
With respect to the "maximum" nature of the life sentences imposed here, we first note that a trial court need not engage in an R.C. 2929.14
sentencing analysis under circumstances such as these where the court is otherwise statutorily mandated to impose a life sentence. Obviously, the trial court cannot abuse discretion it does not have.
Given appellant's concession that appellant's remaining sentences were "near maximum," the trial court was not obliged to engage in the "maximum sentence" analysis. However, given the imposition of multiple and consecutive sentences here, the court was required to engage in an analysis which is virtually the same.
R.C. 2929.14(E)(4) speaks to the imposition of multiple prison terms:
 If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code [sanctions primarily related to OMVI offenses], or was under post- release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
We consider the above with another provision, R.C. 2929.19(B)(2)(c), which requires a trial court to give "its reasons for imposing * * * consecutive sentences."
Given the foregoing statutory framework, a trial court must engage in virtually the same analysis when it imposes maximum and/or consecutive sentences. Therefore, we look to other pertinent statutes to ascertain whether the trial court adequately addressed the R.C. 2929.14(E)(4) factors, which focus on the gravity of the harm to the victim, the "seriousness" of the offender's conduct, and the necessity of protecting the public from future harm, the latter factor implicating recidivism considerations. R.C. 2929.12 enumerates factors to consider in making these determinations.
R.C. 2929.12(B) sets forth factors which might indicate that the offender's conduct is "more serious than conduct normally constituting the offense." In toto, those factors are:
 (1) The physical or mental injury suffered by the victim of the offense due to the conduct of the offender was exacerbated because of the physical or mental condition or age of the victim.
 (2) The victim of the offense suffered serious physical, psychological, or economic harm as a result of the offense.
 (3) The offender held a public office or position of trust in the community, and the offense related to that office or position.
 (4) The offender's occupation, elected office, or profession obliged the offender to prevent the offense or bring others committing it to justice.
 (5) The offender's professional reputation or occupation, elected office, or profession was used to facilitate the offense or is likely to influence the future conduct of others.
 (6) The offender's relationship with the victim facilitated the offense.
 (7) The offender committed the offense for hire or as part of an organized criminal activity.
 (8) In committing the offense, the offender was motivated by prejudice based on race, ethnic background, gender, sexual orientation, or religion.
Division (D) sets forth recidivism factors indicative of those offenders "who pose the greatest likelihood of committing future crimes," as follows:
 (1) At the time of committing the offense, the offender was under release from confinement before trial or sentencing * * * or under post-release control * * * for an earlier offense.
 (2) The offender previously was adjudicated a delinquent child * * * or the offender has a history of criminal convictions.
 (3) The offender has not been rehabilitated to a satisfactory degree after previously being adjudicated a delinquent child * * * or the offender has not responded favorably to sanctions previously imposed for criminal convictions.
 (4) The offender has demonstrated a pattern of drug or alcohol abuse that is related to the offense, and the offender refuses to acknowledge that the offender has demonstrated that pattern, or the offender refuses treatment for the drug or alcohol abuse.
 (5) The offender shows no genuine remorse for the offense.
Turning again to the record before us, we look to discern whether the trial court did sufficiently comply with the applicable sentencing considerations.
In its judgment entry journalizing appellant's conviction and sentence, the trial court included the following language, in pertinent part:
 The Court has considered the purposes and principles of sentencing set forth in R.C. 2929.11 and the factors set forth in R.C. 2929.12, and the Court stated on the record its reasons for imposing this sentence. In addition, the Court has weighed the factors as set forth in the applicable provisions of R.C. 2929.13 and R.C. 2929.14. * * * [Entry at 2; emphasis sic.]
As to the imposition of consecutive life sentences, the trial court did comply with the above statutory considerations. Beginning with the court's findings that appellant is a sexual predator, the court stated:
 THE COURT: The court has heard the facts of the case and the court presided over the trial. The could also had an opportunity to review the presentence report[3]
and the report that was incorporated in the findings, and I will say that this case, this is a case where the two young victims in this case, and where the events occurred over a protracted period of time, and the court considered the nature of the offenses which [appellant] was found guilty of * * *.
* * *
 Now, the court having made that finding relative to the classification, I want to proceed with the sentencing at this time. * * * [Tr. 455-457.]
Appellant was then asked if he had anything to say, to which he responded with general denials of guilt; calling the children liars and problematic because they had been "supposedly * * * molested and raped" in another home; and, declaring his attorney incompetent. He told the judge that he thought it "a hard thing" to express remorse for something that he did not do. (Tr. 460.) The court responded:
 Mr. Rowland, let me tell you something now. I believe, I honestly believe, and I listened to the evidence in this case and I heard all of the evidence presented and you testified and I heard your testimony; and I believe you committed the crimes which you are charged with, and I believe you committed those crimes.
 Let me tell you something else, Mr. Rowland. No one, no one will ever know the harm that has been impacted upon those two young victims, no one will ever know the harm that has been impacted upon them, but I do know that you changed their lives forever.
 I can only imagine what it must have been like to live with you in that house * * * on a daily basis. It had to be close to a living hell, day in and day out not knowing from one minute to the next what your actions would be. That had to come close to a living hell.
 Now, Mr. Rowland, I reviewed the presentence report, I was a little dismayed that you did not cooperate fully * * *, it would have been helpful if I had more information about you, your background, but you did not give any releases
 [APPELLANT]: They would not tell me what the release was for.
THE COURT: You did not comply with that. * * *
* * *
 Mr. Rowland, I have imposed consecutive sentences in this case, and because I have made a finding, and after the case has been concluded, that any less sentence that this court would have imposed relative to these 19 counts would demean the severity, the seriousness of the offenses that you have been found guilty of, and that is precisely the reason I imposed the sentences that I did. Any less sentence would demean the seriousness of these offenses.
 And quite frankly, Mr. Rowland, I don't think, and I want you to understand that I will do everything in my power, I don't think you should ever be released from prison based on the testimony I heard in this courtroom and what this jury, the verdicts that this jury returned, I don't think you should ever be let out of prison. [Tr. 461-462; 464-465.]
We find no reversible error in the sentencing of appellant. The trial court adequately complied with the sentencing statutes by articulating its findings that the consecutive sentences imposed were commensurate with the seriousness of appellant's conduct and its impact upon the victims. The court stated that any other sentence would demean the seriousness of the offenses committed by appellant. The court unequivocally considered the necessity of punishing appellant and protecting the public from potential future danger.
The second assignment is overruled.
Having overruled the assignments of error, the judgment of the trial court is affirmed.
LAZARUS and KENNEDY, JJ., concur.
[1] Following severance of the cases, Ms. Kendall was the first to stand trial, and was ultimately convicted of rape and felonious sexual penetration, which convictions were recently affirmed by this court in State v. Kendall (June 29, 2001), Franklin App. No. 00AP-1098, unreported.
[2] Former R.C. 2907.12 proscribed "felonious sexual penetration" and was in effect at the 1994 onset of appellant's alleged sexual misconduct. However, effective September 3, 1996, prior to the April 2000 indictment issued here, R.C. 2907.12 was repealed. The purpose and effect of the repeal was simply to incorporate the former definition into the present "sexual conduct" definition (R.C. 2907.01[A]) and, hence, specifically clarify that what formerly was defined as "felonious sexual penetration" is now rape.
[3] Appellant has not met his obligation to provide this court with the presentence investigation report. However, the omission does not change the disposition of this case.