OPINION
{¶ 1} Defendant-appellant Roger S. Arrone appeals his conviction and sentence for three counts of felonious assault with firearm specifications. On January 6, 2005, Arrone was indicted on three counts of felonious assault in violation of R.C. § 2903.11(A)(2) with accompanying firearm specifications in violation of R.C. § 2941.145. Arrone entered pleas of "not guilty" to all of the charges on January 14, 2005.
 {¶ 2} On February 24, 2005, Arrone filed a motion to suppress statements he allegedly made to police officers after being arrested. Arrone filed a second motion to suppress identification testimony on March 2, 2005. On April 12, 2005, Arrone filed a motion to sever each of the counts in the indictment. Arrone filed a pro se motion to terminate his counsel on April 13, 2005, which the trial court overruled on April 28, 2005.
 {¶ 3} On May 16, 2005, the trial court overruled Arrone's motion to suppress identification testimony as well as his motion to sever. The trial court sustained in part and overruled in part Arrone's motion to suppress statements he made to the police after he was arrested. Arrone filed another motion to suppress and a motion in limine on May 18, 2005. The trial court issued an order overruling both motions on May 25, 2005.
 {¶ 4} On May 22, 2005, the matter was tried before a jury, and Arrone was found guilty of three counts of felonious assault, each carrying a firearm specification. The trial court ordered that Counts I and II were to run consecutive to each other for a total of 14 years. Count III was to run concurrent to the Counts I and II. The trial court imposed an additional three years for one firearm specification for a total of 17 years imprisonment. In addition, Arrone was ordered to pay restitution, the costs of prosecution, and any fees permitted pursuant to R.C. §2929.18(A)(4).
 {¶ 5} Arrone filed a timely notice of appeal with this Court on July 13, 2005. Subsequent to filing notice of appeal, however, Arrone filed a motion for modification and reduction of sentence on July 22, 2005. The trial court overruled said motion on July 28, 2005. Arrone filed a second appeal of with this Court on August 9, 2005.
 I {¶ 6} The conduct that forms the basis of Arrone's conviction and sentence occurred on the night of December 27, 2004, at approximately 9:30 p.m. As David and Nancy Seelenbinder were traveling west on State Route 444 in David's truck, they observed a green Ford Escort with it emergency flashers on which had been pulled to the side of the road up against a snowbank. David testified that because he and his wife were military medics, they often stopped to assist people who had broken down or been involved in motor vehicle accidents.
 {¶ 7} When the Seelenbinders approached the stopped vehicle, a female, later identified as Lacasta Frusha, ran out in front of David's truck. She ran over to the driver's side of the truck, and as David rolled down the window to speak to her, Frusha allegedly stated:
 {¶ 8} "He's firing. He's firing at me. He's going to fire again."
 {¶ 9} Frusha attempted to run to the passenger side of the Seelenbinder's truck, but before she made it around to the other side, a man appeared at the driver's side window and pointed a firearm at David. The man, later identified as Arrone, told David that if the vehicle moved, he was going to shoot him. David testified that Arrone then asked Frusha if she wanted to see him shoot the Seelenbinders.
 {¶ 10} With some difficulty, Arrone was able to open the driver's side door. David testified that Arrone then yelled at Frusha and discharged his firearm into the air. Arrone then shot through the cab of the truck, shattering the passenger side window. Nancy testified that at this point during the confrontation, she lowered her head between her legs and began to pray. Arrone put the gun to David's head and told Frusha, "I'll shoot him. I'll shoot them right here."
 {¶ 11} David, a martial arts expert, grabbed the gun and attempted to wrestle it out of Arrone's hands. While struggling for the weapon, David was pulled from the truck and onto the ground. Once out of the truck, David was able to take the gun away from Arrone. Arrone fled the scene on foot while Frusha got back in the Escort and drove away. The Seelenbinders called 911 and drove to the Riverside Police Department. David informed the police dispatcher of what had just occurred and that he was in possession of the gun. In the meantime, Kenny Gibson, another traveler on State Route 444, briefly encountered Arrone on the highway. Gibson testified that Arrone told him that he had just been attacked and robbed. Gibson drove on without stopping and called 911. Like the Seelenbinders, Gibson drove to the Riverside Police Department.
 {¶ 12} Shortly thereafter, the Riverside Police were informed of a disturbance at a local hotel involving Arrone. The police, along with deputies from Greene County, responded to the call and detained Arrone. Believing Arrone to be involved in the shooting, the deputies brought David Seelenbinder and Kenny Gibson to the hotel to identify Arrone. After separately viewing Arrone, both men identified him. Arrone was arrested and taken to Greene County Jail.
 {¶ 13} As previously noted, Arrone was found guilty of three counts of felonious assault with firearm specifications and was sentenced to an aggregate prison term of 17 years. It is from this judgment that Arrone now appeals.
 II {¶ 14} Arrone's first assignment of error is as follows:
 {¶ 15} "THE TRIAL COURT ERRED IN FAILING TO PROPERLY INQUIRE INTO APPELLANT'S REQUEST FOR SUBSTITUTION OF COUNSEL."
 {¶ 16} In his first assignment, Arrone contends that the trial court abused its discretion when it overruled his pro se motion requesting new counsel. In particular, Arrone asserts that defense counsel was disrespectful to him and failed to prepare the case in a satisfactory manner. Arrone also argues that the record suggests that defense counsel attempted to pressure him into entering a plea against his wishes. We disagree.
 {¶ 17} "An indigent defendant * * * must demonstrate `good cause' to warrant substitution of counsel." State v. Williams
(2003), 99 Ohio St.3d 493, 794 N.E.2d 27, 2003-Ohio-4396, citingUnited States v. Iles (C.A.6, 1990), 906 F.2d 1122, 1130. A breakdown in the attorney-client relationship will warrant substitution if the breakdown is so severe as to jeopardize the defendant's right to effective assistance of counsel. Id.,
citing State v. Coleman (1999), 37 Ohio St.3d 286, 292,525 N.E.2d 792. The Sixth Amendment does not require that a defendant and his defense counsel develop a "meaningful relationship."Morris v. Slappy (1983), 461 U.S. 1, 103 S.Ct. 1610. Rather, the Sixth Amendment merely requires that defense counsel represent a defendant in a competent and effective manner. Id.
 {¶ 18} "Disagreement between the attorney and client over trial tactics and strategy does not warrant a substitution of counsel. State v. Glasure (1999), 132 Ohio App.3d 227,724 N.E.2d 1165. Moreover, mere hostility, tension, and personal conflicts between attorney and client do not constitute a total breakdown in communication if those problems do not interfere with the preparation and presentation of a defense. State v.Gordon (149 Ohio App.3d 237, 241, 776 N.E.2d 1135,2002-Ohio-2761." State v. Coleman (March 19, 2004), Montgomery App. No. 19862, 2004-Ohio-1305.
 {¶ 19} "When the timing of request for new counsel is an issue, a trial court may make a determination as to whether the appellant's request for new counsel was made in bad faith."State v. Miller (Dec. 26, 2001), Ross App. No. 01CA2607, 2001-Ohio-2635, citing State v. Graves (Dec. 15, 1999), Lorain App. No. 98CA007029. "A motion for new counsel made on the day of trial, `intimates such motion is made in bad faith for the purposes of delay.'" State v. Haberek (1988),47 Ohio App.3d 35, 41, 546 N.E.2d 1361, 1367.
 {¶ 20} "If a court refuses to inquire into a seemingly substantial complaint about counsel when he has no reason to suspect the bona fides of the defendant, or if on discovering justifiable dissatisfaction, a court refuses to replace the attorney, the defendant may then properly claim denial of his Sixth Amendment right. * * * In the absence of a conflict which presents such a Sixth Amendment problem, the trial court has discretion to decide whether to grant a continuance during the course of the trial for the substitution of counsel, and that decision will be reversed only if the court has abused its discretion." United States v. Calabro (C.A. 2, 1972),467 F.2d 973, 986. Thus, we will not reverse the decision of the trial court unless it is arbitrary, unreasonable, or unconscionable.Coleman, supra.
 {¶ 21} During the second half of the motion to suppress hearing held on May 6, 2005, the trial court addressed the issue of Arrone's displeasure with defense counsel in the following exchange:
 {¶ 22} "The Court: Well, Mr. Arrone, we're her today for a motion to suppress. Is there anything that you feel your attorney should do for the purposes of this motion that you would like to bring to this Court's attention?"
 {¶ 23} "Arrone: I brought some questions over for Siefert, for Mr. Siefert."
 {¶ 24} "The Court: Have you shared those questions with Mr. Wilmes [defense counsel]?"
 {¶ 25} "Arrone: No, I haven't had a chance to becuase he was being so rude and obnoxious with me."
 {¶ 26} "The Court: All right. Would you like to take a moment to share those with him?"
 {¶ 27} "Arrone: Yeah."
 {¶ 28} "The Court: All right. We will just stay in place. If you would like to chat about it, you can."
 {¶ 29} "Wilmes: I've reviewed the questions, Your Honor."
 {¶ 30} "The Court: Are you prepared to proceed forward?"
 {¶ 31} "Wilmes: I think so."
 {¶ 32} On the first day of trial, prior to voir dire, the trial court again discussed the subject of Arrone's request for substitution of counsel in the following exchange:
 {¶ 33} "The Court: Okay. Thank you, Mr Wilmes. And, Mr. Arrone, you have the floor. Are there any concerns about any aspect that you wish to present to me at this point in time?"
 {¶ 34} "Arrone: Yeah. I'm going to have to take my chances. I would like for my attorney to resign and be appointed another counsel on the grounds that I don't feel comfortable taking this to trial with Mr. Al — Al Wilmes, because I've presented most of this — most of the law says, you know, I've read the law book, and he seems like he don't care. I mean, he talks to me like I'm a child or something."
 {¶ 35} "The Court: Well, I'm sorry. Go ahead. I didn't mean to cut you off."
 {¶ 36} "Arrone: He talks to me — I know I ain't that smart, you know, but he tallks to me like I'm just nothing. He talked to me like — well, you will be doing this, slang terms. I mean, it's unpresentable, you know. If I don't disrespect him, why should he disrespect me? And that's the point I was trying to tell you earlier when I filed that motion to terminate his counsel, but I couldn't get the words out. So, you know, I feel that I should be able to fire him and get another counsel on grounds to build a better defense for myself."
 {¶ 37} "The Court: What defense would you like for him to present that he is not willing to present for you?"
 {¶ 38} "Arrone: I don't know. We ain't discussed it. I wanted time to discuss a defense with him, but 15 minutes, that's not enough time to even present a defense really."
 {¶ 39} "The Court: Well, I mean, is there anything that you want to say to him that you haven't said so far about your defense?"
 {¶ 40} "Arrone: Well, yeah. I mean, if I could get about 15 minutes, 20 more minutes with him to even talk to him by hisself [sic]."
 {¶ 41} "The Court: Okay. Well, I'm going to give you 15 minutes to talk to him."
 {¶ 42} "Wilmes: I would comment, Your Honor, that the jail records will show how many times I've been there."
 {¶ 43} "The Court: How many times have you been there?"
 {¶ 44} "Wilmes: Oh, probably six, seven."
 {¶ 45} "The Court: All right. Do you want 15 minutes to talk to your attorney at this point?"
 {¶ 46} "Arrone: Yes, please."
 {¶ 47} "The Court: All right. I will give that to you. Now, I'm going to tell you this, Mr. Arrone, Mr. Wilmes is a veteran defense lawyer. He's won acquittals for his clients in many cases. In the for what it's worth department, he's also been involved in cases where the jury has come back guilty. It's just the nature of a defense lawyer. Sometimes they win cases, sometimes they don't. The real question is, does this Court have confidence in his ability to represent you, and I have 100 percent confidence. He's a very thorough attorney. Because he says things to you [that] you don't like, doesn't mean he should be fired, and I don't base it upon those things. Now, if he says to you I think — well, I don't know what he said to you, so I can't comment on anything that he said, but I will say this. His ability to try a case is very good. He is prepared to try this case today and this Court is prepared to go forward. * * *"
 {¶ 48} In the instant case, the record demonstrates that the trial court correctly found that a "complete breakdown in the attorney-client relationship" had not occurred so as to warrant a change in defense counsel. Defense counsel filed numerous pre-trial motions for Arrone including multiple motions to suppress and a motion in limine to exclude taped jail calls from Arrone to Frusha. Defense counsel stated that he had visited Arrone approximately seven times at the jail in order to prepare his case for trial. There is nothing in the record which suggests that defense counsel was neglectful in his representation of Arrone. Simply because a defendant feels that defense counsel is acting in a condescending manner towards him is not a basis upon which a trial court can grant a motion for substitution of counsel. Defense counsel in the present case performed his duties as Arrone's attorney in a competent and attentive manner. Thus, the trial court did not abuse its discretion when it denied Arrone's request for substitution of counsel.
 {¶ 49} Arrone's first assignment of error is overruled.
 III {¶ 50} Arrone's second assignment of error is as follows:
 {¶ 51} "THE TRIAL JUDGE ERRED IN REFUSING TO REMOVE HIMSELF FROM APPELLANT'S CASE AFTER INDICATING THAT HE WOULD PENALIZE APPELLANT FOR EXERCISING HIS RIGHT TO TRIAL."
 {¶ 52} In his second assignment, Arrone contends that the trial judge should have recused himself because of certain statements made regarding sentencing should the case proceed to trial. Arrone asserts that during a pre-trial conference, the trial judge essentially stated that he would impose a harsher sentence unless Arrone pled to the named offenses. We disagree.
 {¶ 53} Canon 3(C)(1)(a) of the Code of Judicial Conduct requires a judge to disqualify himself when "he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." A trial judge is "presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity." State v. Johnson (October 24, 1997), Darke App. No. 96CA1427, citing Okocha v. Fehrenbacher
(1995), 101 Ohio App.3d 309, 322, 655 N.E.2d 744.
 {¶ 54} Arrone argues that the following exchange with defense counsel reveals the trial judge's prejudice:
 {¶ 55} "Wilmes: Finally, your Honor, I think what the defendant is asking that I do is make an oral motion for judicial disqualification on this case. * * * It's been maybe three weeks ago, something like that, we had a conference which I requested in-camera. At that time, I was trying to get some guidelines as to possible sentencing options, possible plea arrangements, didn't succeed too much, and I came back and talked to him with what I garnered to be the position that the Court may be taking, which was, if you go to trial and act the way you did at your motion hearings and don't present any kind of viable defense, you're going to get more time than if, in fact, you take responsibility and plead. And then I quoted, I said, `The Judge seems to feel that if you act the way you did in Court and if you present yourself and if the facts play out the way they seem to be playing out, that you're the kind of person that shouldn't see the light of day for a long time.'
 {¶ 56} "I commented on that as a possibility of consideration he ought to make in whether he should enter a plea or not; not the only consideration, one of many, and he finds that may indicate a certain bias or prejudice against him before trial or before sentencing, so he's insisting that I make this oral motion. Thank you.
 {¶ 57} "The Court: * * * Mr. Arrone, can you elaborate a little bit more on what your counsel has presented at this time and is your concern in this case?
 {¶ 58} "Arrone: I just want a fair trial, that's all."
 {¶ 59} "The Court: And why do you feel that I cannot preside over your trial which would be fair."
 {¶ 60} "Arrone: Because I filed motions for another attorney. You told me that — they said my best interest is for me to stick with him. I felt that it wasn't in my best interest to stick with him."
 {¶ 61} "The Court: I'm not following you. Are you concerned about your attorney, is that — ?"
 {¶ 62} "Arrone: No. I mean, I feel that there's just a lot of bias in this case."
 {¶ 63} "The Court: Okay. That's what I'm asking you about. What is the bias that is a concern to you? I need to be aware of that."
 {¶ 64} "Arrone: * * * I'm trying. I mean, even though — I don't know how to present this. I mean, really, I've got all these people saying that I did this and then when I told my story, you know, it's like nobody believed me."
 {¶ 65} "The Court: Well, you're going to have a jury here and you will be able to testify or not testify and the jury will make a decision. I don't make, nor does your attorney, nor the Prosecutor make the decision as to whether you're guilty or not guilty. That's strictly the jury's decision. And so your [sic] sense of what was believed or not believed is different."
 {¶ 66} * * *
 {¶ 67} "Wilmes: (speaking to Arrone) Tell him what else you've got, and if you want another counsel, tell him why. I'd say if the defendant, your Honor, is going to contend there's bias or prejudice on anyone's part, the Court, that he ought to articulate it now because I don't know what he's talking about."
 {¶ 68} "The Court: Well, the key here, Mr. Arrone, is that I want to see that you receive a fair trial. If you tell me you have concerns, I'm going to be active in attempting to see that those concerns are addressed and no unfairness will occur. * * * I want to make it very clear for the record that your attorney pressed me to say what I would impose as a sentence in this case and I would not tell him what I would sentence in this case. Is that correct, Mr. Wilmes?"
 {¶ 69} "Wilmes: Yes."
 {¶ 70} "The Court: And the reason I did this is that I don't know the answer at this point. First off, you haven't been found guilty of anything. So it's premature to discuss a sentence. Secondly, I've not fully heard the facts of this case, so I'm not certain that I could give an opinion as to a sentence at this point in time. * * * So, if you are found guilty, I think it would be fair to say, particularly with a firearm specification being found guilty as well, that a prison term is likely. What the extent of that term will be, I cannot tell anyone at this point in time because, again, you've not been found guilty of anything. So I think that's a fair comment of what I indicated to your attorney previously and I will say it to you on the record now."
 {¶ 71} It is abundantly clear from the above excerpt that the trial judge was not prejudiced against Arrone for exercising his right to trial. The trial judge, after listening to Arrone's in-artfully phrased complaints, slowly and deliberately explained the trial process to him. The trial judge then explained his own thought process with respect to sentencing and that he would make no decisions on sentencing until a verdict was rendered by the jury. After thoroughly reviewing the record, we find that Arrone has failed to demonstrate any improper conduct or prejudice warranting reccusal.
 {¶ 72} Arrone's second assignment of error is overruled.
 IV {¶ 73} Arrone's third assignment of error is as follows:
 {¶ 74} "THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS UNRELIABLE IDENTIFICATION TESTIMONY."
 {¶ 75} In his third assignment, Arrone contends that the trial court erred when it overruled his motion to suppress identification testimony provided by David Seelenbinder and Kenny Gibson. Arrone argues that the procedure used by the police to identify him as the perpetrator was too suggestive and violated his Fourteenth Amendment rights. Essentially, Arrone asserts that the show-up identification procedure was unnecessarily suggestive of his guilt, and the witness' identification was unreliable under the totality of the circumstances.
 {¶ 76} At a suppression hearing, the trial court serves as the trier of fact and must judge the credibility of the witnesses and weigh the evidence. State v. Fanning (1982),1 Ohio St.3d 19, 20, 437 N.E.2d 583, 584-585. In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies upon the trial court's ability to assess the credibility of witnesses, and independently determines "without deference to the trial court, whether the trial court has applied the appropriate legal standard." Statev. Baker (1997), 118 Ohio App.3d 654, 658, 693 N.E.2d 1131.
 {¶ 77} A "show-up" is inherently suggestive. Ohio v.Barnett (1990), 67 Ohio App.3d 760, 588 N.E.2d 887. The question of whether a show-up of a suspect to alleged victims of crime is unduly suggestive depends on the totality of the circumstances.State v. Potter (October 16, 1998), Montgomery App. No. C.A. 16928, citing Stovall v. Denno (1967), 388 U.S. 293,87 S.Ct. 1967; State v. Benson (July 14, 1995), Montgomery App. No. 14427.
 {¶ 78} "The reliability of the identification depends upon the following factors: 1) the opportunity of the witness to see the perpetrator; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description; 4) the witness' level of certainty in the identification; and 5) the length of time between the crime and the confrontation." Potter, supra, citingNeil v. Biggers (1972), 409 U.S. 188, 199-200, 93 S.Ct. 375.
 {¶ 79} While Gibson waited at the Riverside Police Department after allegedly being approached by Arrone on State Route 444, he overheard a police dispatch stating that they had caught a suspect. Gibson and David Seelenbinder were then taken to the hotel where Arrone had been apprehended in order to identify him. Arrone does not assert that David Seelenbinder heard the police dispatch which Gibson did. Arrone does contend, however, that as a result of Gibson overhearing the police dispatch, his show-up identification was rendered unduly suggestive and therefore, inadmissible. While this is problematic, it is not necessarily fatal to Gibson's identification of Arrone.
 {¶ 80} Gibson provided the following testimony at the motion to suppress:
 {¶ 81} "Q: Did you go down to the police station later?"
 {¶ 82} "Gibson: Yes, went down to Riverside."
 {¶ 83} "Q: Did they show you any photographs?"
 {¶ 84} "Gibson: No."
 {¶ 85} "Q: Did they describe anyone and ask you — did they give you a physical description of anyone?"
 {¶ 86} "Gibson: No."
 {¶ 87} "Q: What did they say to you?"
 {¶ 88} "Gibson: I just stopped and said that I had seen somebody on the side of the road that was getting robbed and I called 911, and at that point they got a radio dispatch saying they caught the suspect and they needed a possible ID, and they asked me would I be able to ID the guy that was being robbed."
 {¶ 89} "Q: Did you describe this guy to the police?"
 {¶ 90} "Gibson: No, just what he was wearing, that was it."
 {¶ 91} * * *
 {¶ 92} "Q: Were you presented with a suspect?"
 {¶ 93} "Gibson: I had to wait in the car for a while, and then the only thing, he said come up and ID the guy, shined the light on him, and at that point, `Yeah, that was the guy that jumped out in front of me.' Didn't know nothing further than that than [sic]."
 {¶ 94} Gibson testified that when he encountered Arrone on the roadway, Arrone told him that he had just been robbed at gunpoint by the Seelenbinders. At the time of the encounter, Gibson was unaware that Arrone was the actual perpetrator of the crime. When Gibson was taken to the hotel to identify Arrone, he was still under the impression that he was going to identify the man whom he thought was a robbery victim. Even so, just because Gibson overheard the police dispatch identifying Arrone as a possible suspect does not render the resulting positive identification unduly suggestive. The fact that police have a possible suspect is necessarily implied whenever someone is shown to an alleged crime victim or witness for purposes of identification. Potter, supra.
 {¶ 95} Arrone also argues that the positive identification should be suppressed because neither David Seelenbinder nor Gibson were able to immediately identify Arrone. This argument is unpersuasive. The police brought Seelenbinder and Gibson to the hotel to identify Arrone just ninety minutes after the alleged robbery occurred. Both witnesses had ample time to view Arrone unobstructed at the time of the crimes. It is also important to note that Seelenbinder and Gibson viewed Arrone separately to eliminate any taint in the identification procedure. The men could not initially see Arrone clearly because he was seated in a police cruiser and was obscured by glare on its window. Moreover, Seelenbinder testified that when Arrone saw him walking up to the cruiser, Arrone pulled his baseball cap down and twisted around in the seat so Seelenbinder would not be able to get a good look at him. Once the police removed Arrone from the cruiser, both men were separately and readily able to identify him. Thus, we hold that the trial court properly found that the results of the identification procedure conducted by police were reliable and not unduly suggestive.
 {¶ 96} Arrone's third assignment of error is overruled.
 V {¶ 97} Arrone's fourth assignment of error is as follows:
 {¶ 98} "THE TRIAL COURT ERRED IN FAILING TO SUPPRESS APPELLANT'S STATEMENTS."
 {¶ 99} In his fourth assignment, Arrone contends that the trial court erred when it failed to suppress all statements he made to authorities while being transported to the Greene County Jail after he was arrested. Arrone argues that since the trial court found that he did not make a knowing, intelligent, and voluntary waiver of his constitutional rights, any statements he made to Deputy Brian Siefert should have been suppressed. Instead, the trial court suppressed only those statements made by Arrone in response to direct questioning from Deputy Siefert after being placed in the police cruiser. However, the trial court did permit the State to introduce several volunteered statements made by Arrone which were not the product of any questioning by Deputy Siefert. Arrone asserts that this amounts to reversible error. We disagree.
 {¶ 100} "Whether a statement was made voluntarily and whether an accused voluntarily, knowingly, and intelligently waived [his] right to counsel and right against self-incrimination are distinct issues." State v. Patterson (March 24, 2006), Montgomery App. No. 20977, 2006-Ohio-1422, citing State v. Eley
(1996), 77 Ohio St.3d 174, 178, 672 N.E.2d 640. For a defendant's statement to be found admissible, the State must demonstrate that: (1) the accused was given Miranda warnings prior to interrogation; (2) after receipt of the warnings, the defendant made an express statement that he desired to waive his constitutional rights; and (3) the defendant made a voluntary, knowing, and intelligent waiver of those rights. State v.Edwards (1976), 49 Ohio St.2d 31, 38, 358 N.E.2d 1051.
 {¶ 101} The State does not dispute the trial court's initial finding that Arrone did not provide a knowing, intelligent, and voluntary waiver of his constitutional rights before answering questions posed to him by Deputy Siefert. At the suppression hearing, Deputy Siefert testified that before placing Arrone in his cruiser, he orally informed him of his Miranda rights. Deputy Siefert further testified that Arrone waived his rights at that time. Arrone, on the other hand, testified that Deputy Siefert did not inform him of his Miranda rights at any point during the arrest, and the audio/videotape of their conversation which was captured by equipment in Deputy Siefert's cruiser does not demonstrate that Arrone was apprised of his rights while being transported to jail. Additionally, Arrone alleged that at the time he was arrested, he was under the influence of both alcohol and crack cocaine, and was, therefore, unable to make a knowing and voluntary waiver of his rights.
 {¶ 102} The trial court explicitly found that in light of Arrone's "apparent intoxication, the Court can not [sic] assume that Defendant did in fact knowingly, intelligently, and voluntarily waived [sic] the exercise of his Miranda rights." Judgment Entry (May 16, 2005), pg. 7. Thus, even if the trial court believed Deputy Siefert's testimony that he properlyMirandized him, the trial court held that Arrone's degree of intoxication rendered him unable to provide a knowing and intelligent waiver of his constitutional rights. In light of this finding, the trial court suppressed any statements Arrone made in response to questioning by Deputy Siefert.
 {¶ 103} At issue in the present appeal, however, are spontaneous, incriminating statements made by Arrone in the police cruiser which were not the result of any interrogation by Deputy Siefert. "The procedural safeguards identified inMiranda apply only when a suspect is subjected to `custodial interrogation,' which means questioning initiated by law enforcement officers after a person has been taken into custody."State v. Johnson (March 25, 2005), Montgomery App. No. 20624,2005-Ohio-1367, citing State v. Hoffner (2004),102 Ohio St.3d 358, 811 N.E.2d 48, 204-Ohio-3430. The statements allowed into evidence by the trial court were allegedly made by Arrone after Deputy Siefert had curtailed his questioning. We agree with the trial court that the statements Arrone volunteered after Deputy Siefert had stopped questioning him are not protected byMiranda safeguards. "Statements made on the subject's own initiative in the absence of questions or other conduct by police do not constitute `interrogation.'" Johnson, supra, citingCity of Akron v. Milewski (1985), 21 Ohio App.3d 140,487 N.E.2d 582. Thus, the trial court did not abuse its discretion when it allowed into evidence the statements Arrone made after Deputy Siefert had stopped questioning him.
 {¶ 104} Lastly, the statements made by Arrone on the day after his arrest to Detective Robert Walton were made after Arrone had signed a Miranda waiver form. Detective Walton testified that when he apprised him of his constitutional rights, Arrone was not under the influence of any drugs or alcohol, nor was he coerced into making a statement concerning the alleged crime. Thus, any statements made by Arrone to Detective Walton were made as a result of a knowing and voluntary waiver of hisMiranda rights.
 {¶ 105} Arrone's fourth assignment of error is overruled.
 VI {¶ 106} Arrone's fifth assignment of error is as follows:
 {¶ 107} "THE TRIAL COURT VIOLATED APPELLANT'S RIGHT TO SILENCE THROUGH ORDERING APPELLANT TO ANSWER A QUESTION POSED TO HIM IN A SUPPRESSION HEARING."
 {¶ 108} In his fifth assignment, Arrone contends that the trial court erred when it ordered him to answer a question posed by the State during his cross-examination at the suppression hearing held on May 6, 2005. Specifically, Arrone asserts that the following exchange during the suppression hearing violated his constitutional right to remain silent:
 {¶ 109} "The State: So it would be fair to say you have selective certainty. You can remember some things very certain, but you can't remember other things very clear, is that what you're telling me?"
 {¶ 110} "Wilmes (defense attorney): Objection, argumentative."
 {¶ 111} "Arrone: I refuse to answer that question."
 {¶ 112} "The Court: Wait a second. Overruled. Go ahead."
 {¶ 113} "The State: Answer the question. You don't get to pick what to answer."
 {¶ 114} "Arrone: I refuse to answer that question that will incriminate me."
 {¶ 115} "The State: Well, you've already taken the stand here. I don't think there's an issue there, Judge."
 {¶ 116} "Wilmes: Objection. It's argumentative."
 {¶ 117} "The Court: Well . . ."
 {¶ 118} "The State: I didn't know the Defendant gets to pick and choose what questions he answers on the stand."
 {¶ 119} "The Court: Mr. Arrone, when you take the stand, I've already indicated to you, what you say here is going to be used for the purposes of this motion. You do not have the right to not answer the questions. So you have to answer the question posed by the Prosecutor. Would you reask the question."
 {¶ 120} As noted by the State, the question posed was related to Arrone's ability to perceive events as well as his selective memory. When Arrone elected to testify in his own defense at the suppression hearing, he subjected himself to cross-examination on his limited recall and credibility. Moreover, the question asked by the State was not beyond the scope of questions posed on direct examination by Arrone's own counsel. Thus, it was not improper for the trial court to compel Arrone to answer the State's question regarding his ability to remember events which directly affected his credibility as to issues relevant to the suppression hearing.
 {¶ 121} Arrone's fifth assignment of error is overruled.
 VII {¶ 122} Arrone's sixth assignment of error is as follows:
 {¶ 123} "APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL THROUGH PROSECUTORIAL MISCONDUCT."
 {¶ 124} In his sixth assignment, Arrone contends that he was denied a fair trial in light of numerous instances of prosecutorial misconduct. Arrone asserts that the State made comments throughout the trial clearly directed to inflame the emotions of the jurors and prejudice his case. Specifically, Arrone argues that trial court permitted the prosecutor to engage in improper conduct during his opening statement and closing argument. We disagree.
 {¶ 125} The test for prosecutorial misconduct is whether the remarks were improper and, if so whether they prejudicially affected the accused's substantial rights. State v. Smith
(1984), 14 Ohio St.3d 13, 14-15, 470 N.E.2d 883. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips (1982),455 U.S. 209, 219, 103 S.Ct. 940.
 {¶ 126} Prosecutors are afforded wide latitude in the presentation of both their opening statements and closing arguments. State v. Jacks (1989), 63 Ohio App.3d 200, 210,578 N.E.2d 512; State v. Baker (2005), 159 Ohio App.3d 462,824 N.E.2d 162, 2005-Ohio-45. For a prosecutor's closing argument to be prejudicial, the remarks must be "so inflammatory as to render the jury's decision a product solely of passion and prejudice."State v. Williams (1986), 23 Ohio St.3d 16, 20, 490 N.E.2d 906. "Even if the prosecutor's statements during closing arguments are improper, reversal based upon those statements is warranted only if the statements permeate the entire atmosphere of the trial."State v. Tumbleson (1995), 105 Ohio App.3d 693, 699,664 N.E.2d 1318.
 {¶ 127} After a thorough review of the entire record in this matter, we can find no evidence of prosecutorial misconduct at any point during the trial. The statements made by the prosecutor during his opening statement were facts established by testimony elicited at trial. Additionally, the conclusions drawn by the prosecutor in his closing argument were also supported by evidence adduced at trial. The manner in which the prosecutor presented his arguments, while certainly designed to hold the attention of the jurors, was not inflammatory nor prejudicial. Simply put, any of the statements made by the prosecutor during his opening statement and closing argument were firmly rooted in the evidence the State expected to present and did, in fact, produce during trial.
 {¶ 128} While we agree with Arrone that the prosecutor did ask some leading questions of two of his own witnesses, we do not agree that these actions rose to the level of misconduct nor a denial of due process. As Arrone points out, the trial court repeatedly sustained defense objections to the prosecutor's questions. More importantly, Arrone fails to demonstrate how the leading questions asked by the prosecutor created an unfair trial or affected his substantial rights. Lastly, the evidence demonstrated that David Seelenbinder and Kenneth Gibson were able to immediately identify Arrone at the scene once the police removed him from the cruiser and he was no longer able to conceal himself from view. Thus, we find that the prosecutor's conduct did not rise to a level which adversely effected Arrone's substantial rights nor did it deprive Arrone of a fair trial.
 {¶ 129} Arrone's sixth assignment of error is overruled.
 VIII {¶ 130} Arrone's seventh assignment of error is as follows:
 {¶ 131} "APPELLANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND EFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 132} In his seventh assignment, Arrone contends that he received ineffective assistance of counsel. In support of this assertion, Arrone cites the following arguments: 1) general dissatisfaction with defense counsel's performance and lack of preparation prior to trial; and 2) defense counsel's failure to object to certain portions of Nancy Seelenbinder's testimony.
 {¶ 133} "When considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." State v. Bradley
(1989), 42 Ohio St.3d 136, 538 N.E.2d 373, citing State v.Lytle (1976), 48 Ohio St.2d 391, 396-397, 358 N.E.2d 623, 627, vacated in part on other grounds (1978), 438 U.S. 910,98 S.Ct. 3135.
 {¶ 134} The above standard contains essentially the same requirements as the standard set forth by the United States Supreme Court in Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052. "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, supra, at 687-688. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.
Thus, counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. Id.
 {¶ 135} For a defendant to demonstrate that he has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, absent counsel's errors, the result of the trial would have been different. Bradley, supra, at 143. A reasonable probability is a probability sufficient to undermine confidence in the outcome.Strickland, supra, at 694.
 {¶ 136} Initially, Arrone argues that he was not satisfied with the performance of his counsel from the beginning of their relationship. He described defense counsel as rude and condescending. However, as we previously stated in our analysis of Arrone's first assignment of error, there is nothing in the record which suggests that defense counsel was neglectful in his representation of Arrone. Simply because a defendant feels that defense counsel is acting in a condescending manner towards him is not a basis upon which we can find ineffective assistance of counsel. Defense counsel in the present case performed his duties as Arrone's attorney in a competent and assertive manner.
 {¶ 137} After a thorough review of the record, it is abundantly clear that defense counsel's performance did not fall below an objective standard of reasonableness. Arrone's assertion that defense counsel could have been better prepared for the introduction of the audiotape of the interview with Detective Walton does not rise to the level of ineffective assistance of counsel. Arrone's counsel attempted to mitigate the damage done by the playing of the tape by objecting to the introduction of the conversation as being more prejudicial than probative on the issue of Arrone's alleged guilt. Defense counsel specifically told the judge that he wanted to have the entire content of the tape stricken from the record. Defense counsel's objection, while not resulting in exclusion of the tape from evidence, did result in a curative instruction to the jury from the trial court. Thus, Arrone's assertion is without merit.
 {¶ 138} Additionally, a review of the trial transcript indicates that when defense counsel asked David Seelenbinder whether he had mentioned a gun being fired at the suppression hearing, he was pursuing a certain line of questioning designed to elicit a particular answer. A debatable decision involving trial tactics generally does not constitute a deprivation of effective counsel. State v. Phillips (1995), 74 Ohio St.3d 72,656 N.E.2d 643, 1995-Ohio-171. In State v. Clayton (1980),620 Ohio St.2d 645, the Ohio Supreme Court discussed an attorney's choice of trial strategy and stated the following:
 {¶ 139} "* * * the fact that there was another and better strategy available does not amount to a breach of an essential duty to his client."
 {¶ 140} Arrone is unable to overcome the "strong presumption" that defense counsel's performance constituted reasonable assistance. Many times, a proper course of action is more readily discernable in hindsight. In this instance, we will not attempt to second guess defense counsel's decision with respect to the his questioning of David Seelenbinder. The same analysis applies to defense counsel's failure to object to portions of Nancy Seelenbinder's testimony. Counsel's omission, which could clearly be viewed as trial strategy, does not rise to the level of ineffective assistance.
 {¶ 141} Arrone's seventh assignment of error is overruled.
 IX {¶ 142} Arrone's eighth and final assignment of error is as follows:
 {¶ 143} "APPELLANT WAS DEPRIVED OF DUE PROCESS AND A FAIR TRIAL THROUGH THE TRIAL COURT'S ERRONEOUS RULINGS."
 {¶ 144} In his final assignment, Arrone contends that the trial court erred when it overruled defense counsel's objections to portions of the testimony of two of the State's witnesses, Deputy Siefert and Captain Hughes. Arrone also argues that the trial court abused its discretion when it allowed the introduction of certain of the State's exhibits. Arrone asserts that the State produced insufficient evidence to convict him of felonious assault pursuant to R.C. § 2903.11(A)(2). Lastly, Arrone contends that the trial court erred in sentencing him to 17 years in prison, as well as failing to merge the three firearm specifications.
 {¶ 145} We note that the trial court is vested with broad discretion concerning the admissibility of evidence. State v.Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804. Thus, we will reverse the trial court's determination only where the appellant demonstrates that the court has abused that discretion. "The term discretion involves the idea of choice, of an exercise of the will, of a determination made between competing considerations."State v. Jenkins (1984), 15 Ohio St.3d 164, 222,473 N.E.2d 264, 313. In order to constitute an abuse of discretion, the challenged ruling must be "so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." Nakoff v. Fairview Gen. Hosp. (1996), 75 Ohio St.3d 254,256, 662 N.E.2d 1, 3. An appellate court will not disturb the exercise of that discretion absent a showing that the accused has suffered material prejudice. State v. Sage (1987),31 Ohio St.3d 173, 182, 510 N.E.2d 343, 350.
 {¶ 146} The threshold standard for authenticating evidence pursuant to Evid. R. 901(A) is low, and "does not require conclusive proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that * * * [the evidence] is what its proponent claims it to be." Statev. Easter (1991), 75 Ohio App.3d 22, 25, 598 N.E.2d 845, 847.
 {¶ 147} Arrone initially argues that the trial court erred when it allowed the State to ask Deputy Siefert if he patted down Arrone to check for additional weapons. Arrone argues that this was improper because he was unarmed when he was taken into custody by Deputy Siefert. However, this argument ignores the fact that testimony had previously been elicited that Arrone was initially in possession of a firearm which he used to threaten the Seelenbinders and his girlfriend, Frusha. He was not in possession of the gun at the time of his arrest because David Seelenbinder had taken it away from him. Thus, the State's question was proper.
 {¶ 148} Arrone next argues that Captain Hughes did not possess the requisite expertise to testify with respect to whether the Evercom Phone System produced fair and accurate recordings of telephone calls. The Evercom System is designed to record telephone calls and was installed in the jail where Arrone was incarcerated to track inmate phone activity. The Evercom System was used to record a phone call between Arrone and Frusha wherein he made allegedly incriminating statements.
 {¶ 149} Arrone argues that it was not established that Captain Hughes was an expert as to the reliability of the Evercom System. Captain Hughes testified that he received training in the use of the Evercom System, had experience using the system for approximately seven years, and that in his experience, the Evercom made fair and accurate recordings of telephone calls to and from the jail. Clearly, the proper foundation was laid to introduce Captain Hughes' testimony as to the reliability of the Evercom System.
 {¶ 150} Next, Arrone argues that an improper foundation was laid for the introduction of the firearm report. Arrone contends that the State's expert, Chris Monturo, did not establish that he had properly tested the gun and that the results and his conclusions were credible. The report was properly admitted after Monturo testified that he had personally examined and test-fired the weapon. Additionally, Monturo explained the test-firing process in his testimony.
 {¶ 151} Arrone also asserts that photographs of the Seelenbinder's truck as it appeared after the shooting were not fair and accurate representations. Deputy Prall authenticated the photographs and testified that they were fair and accurate representations at the time that he took them. Arrone's argument goes to the weight to be accorded the photographs. That is a question for the trier of fact. It has nothing to do with the admissibility of the evidence which was properly authenticated by the individual who took the pictures.
 {¶ 152} The last piece of evidence that Arrone argues the trial court should have excluded was the micro cassette that contained the recorded interview of Arrone conducted by Detective Walton. Arrone simply argues that this evidence was cumulative in nature and should not have been admitted into evidence. Pursuant to Evid. R. 403(B), it is within the sound discretion of the trial court to exclude cumulative evidence only when the probative value of the evidence is substantially outweighed by the danger of a material prejudice to the defendant. Other than asserting that the micro cassette was cumulative evidence, Arrone fails to demonstrate how he was materially prejudiced by its admission. As the State notes, the tape was properly authenticated by Detective Walton and is a "statement by a party opponent" pursuant to Evid. R. 801(D)(2). The contents of the tape could clearly aid the jury in reaching a verdict. Thus, we are unpersuaded that the micro cassette is cumulative in nature or that the trial court abused its discretion in admitting said evidence.
 {¶ 153} Arrone next argues that the evidence was insufficient to support a conviction for felonious assault pursuant to R.C. §2903.11(A)(2). Arrone cites State v. Brooks (1989),44 Ohio St.3d 185, for the proposition that the act of pointing a deadly weapon at another, without additional evidence regarding the actor's intention, is insufficient evidence to convict a defendant of felonious assault. While this statement is certainly true, Arrone ignores the overwhelming evidence indicative of the fact that he made multiple threats to the lives of the Seelenbinders while pointing a firearm directly at David Seelenbinder's chest and head. It also ignores the fact that he shot into their vehicle. Thus, the trial court properly instructed the jury on the offense of felonious assault for which he was ultimately found guilty.
 {¶ 154} Lastly, Arrone argues that the trial court erred when it sentenced him to 17 years in prison for exercising his right to trial. There is simply no evidence in the record that supports Arrone's assertion that the trial court sentenced him as it did merely for exercising his right to trial. Arrone's conviction for felonious assault carries a presumption of prison pursuant to R.C. § 2929.13(D). However, under State v. Foster (2006),109 Ohio St.3d 1, 2006-Ohio-856, the Supreme Court of Ohio recently held that R.C. § 2929.14(E)(4) governing imposition of consecutive sentences for multiple offenses is unconstitutional. Consistent with Foster's mandate, we reverse the sentence that was imposed and remand this case for a new sentencing hearing.
 {¶ 155} Contrary to Arrone's final assertion, we find that the trial court did merge the three firearm specifications into one.
 {¶ 156} Arrone's final assignment of error is overruled in part and sustained in part.
 X {¶ 157} Based on the foregoing, Arrone's initial seven assignments of error are overruled. With respect to the portion of Arrone's eighth assignment of error which pertains to sentencing, the trial court's judgment is reversed, and this cause is remanded for resentencing in accordance with the holding in Foster, supra. In all other respects, Arrone's eighth assignment of error is overruled.
 {¶ 158} Judgment affirmed in part, reversed in part, and this cause is remanded for resentencing.
Grady, P.J. and Valen, J., concur.
(Hon. Anthony Valen retired from the Twelfth District Court of Appeals sitting by assignment of the Chief Justice of the Supreme Court of Ohio).